1  JOHN P. RELMAN*
   REED COLFAX*
2  GLENN SCHLACTUS Bar No. 208414
   STEPHEN HAYES*
3  SASHA SAMBERG-CHAMPION*
4  SARA PRATT*
   ZACHARY BEST*
5  RELMAN COLFAX PLLC
   1225 19th St. NW, Suite 600
6  Washington, D.C. 20036
   Telephone: (202) 728-1888
7  Fax: (202) 728-0848
   jrelman@relmanlaw.com
8  rcolfax@relmanlaw.com
   gschlactus@relmanlaw.com
9  shayes@relmanlaw.com
   ssamberg-champion@relmanlaw.com
10 spratt@relmanlaw.com
   zbest@relmanlaw.com
11

12
   *Attorneys for all Plaintiffs*
13

14 AJMEL QUERESHI*
   COTY MONTAG Bar No. 255703
15 NAACP LEGAL DEFENSE &
   EDUCATIONAL FUND, INC.
16 700 14th St. NW, Suite 600
   Washington, DC 20005
17 (202) 682-1300
   aquereshi@naacpldf.org
18 cmontag@naacpldf.org

19 *Attorneys for all Plaintiffs*

20

21

ALLISON M. ZIEVE*
PUBLIC CITIZEN LITIGATION GROUP
1600 20th St. NW
Washington, DC 20009
(202) 588-1000

*Attorney for all Plaintiffs*

MORGAN WILLIAMS*
NATIONAL FAIR HOUSING
ALLIANCE
1331 Pennsylvania Ave., NW, Suite 610
Washington, D.C. 20004
Telephone: (202) 898-1661
mwilliams@nationalfairhousing.org

*Attorney for Plaintiff NFHA*

JULIA HOWARD-GIBBON Bar No.
321789
FAIR HOUSING ADVOCATES OF
NORTHERN CALIFORNIA
1314 Lincoln Ave., Suite A
San Rafael, CA 94901
(415) 483-7516
julia@fairhousingnorcal.org

*Attorney for Plaintiff Fair Housing
Advocates of Northern California*

* *Pro Hac Vice Application Forthcoming*

22

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA

23

24 | **NATIONAL FAIR HOUSING ALLIANCE;** | ) |
   | | ) |
25 | **FAIR HOUSING ADVOCATES OF** | ) |
   | **NORTHERN CALIFORNIA;** and | ) Case No. _____ |
26 | | ) |
27 | **BLDS, LTD d/b/a BLDS, LLC;** | ) **COMPLAINT** |
   | | ) |
28 | Plaintiffs, | ) **ADMINISTRATIVE** |
   | | ) **PROCEDURE ACT CASE** |

COMPLAINT
National Fair Housing Alliance, Fair Housing Advocates of Northern California, and BLDS, LTD d/b/a BLDS, LLC v. Ben Carson and U.S. Department
of Housing and Urban Development

1    v.                                            )
                                                   )
2    **BEN CARSON, Secretary of the U.S.**         )
     **Department of Housing and Urban**           )
3    **Development, in his official capacity;** and )
                                                   )
4    **U.S. DEPARTMENT OF HOUSING AND**            )
     **URBAN DEVELOPMENT;**                        )
5                                                  )
                                                   )
6                                                  )
       Defendants.                                 )
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT
National Fair Housing Alliance, Fair Housing Advocates of Northern California, and BLDS, LTD d/b/a BLDS, LLC v. Ben Carson and U.S. Department
of Housing and Urban Development

**INTRODUCTION**

1.     For nearly fifty years, disparate-impact claims have played a central role in making the promise of the federal Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, a reality for millions of Americans. This lawsuit challenges as violative of the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* ("APA"), a new rule promulgated by Defendants the U.S. Department of Housing and Urban Development and its Secretary Ben Carson (together "HUD") that radically alters, and effectively eviscerates, well-settled disparate-impact doctrine. The new rule makes it nearly impossible for plaintiffs to prevail in a disparate-impact case, thus undoing decades of hard-won fair housing and fair lending progress in cities and counties across the nation.

2.     In recent months, vast numbers of Americans of all races are recognizing how deeply structural racism is engrained in the nation and the importance of rooting it out. The institutions and realities of life in America have been and remain fundamentally shaped by our history, including slavery, Jim Crow, and the fiction of "separate but equal."

3.     The Fair Housing Act was enacted in 1968 with the ambitious purpose of eliminating to the greatest extent possible the role played by structural inequalities and racism in all facets of the housing market. Accomplishing that purpose requires more than prohibiting explicitly discriminatory acts. It also requires prohibiting facially neutral policies and practices that have an unnecessary disparate and negative impact on Black people and members of other protected classes. From the beginning, courts held that the Fair Housing Act bars such policies and practices by recognizing disparate-impact claims.

4.     HUD agreed, and in 2013 it adopted a rule that codified the principles courts had employed for decades to adjudicate disparate-impact claims under the Act. Two years later, the Supreme Court agreed, too, finding that "[r]ecognition of disparate-impact claims is consistent with the FHA's central purpose . . . . to eradicate discriminatory practices within [the housing] sector," *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project*, 576 U.S. 519, 539 (2015) ("*Inclusive Communities*"). It described with approval the then-existing state of the law.

5.      HUD has now, however, adopted a rule gutting five decades of settled law regarding disparate-impact claims, including its own rule from 2013. *See* HUD's Implementation of the Fair Housing Act's Disparate Impact Standard, 85 Fed. Reg. 60288 (Sept. 24, 2020) ("Final Rule"). The new rule takes effect in 4 days, on October 26.

6.      The central tenet of disparate-impact law under the Act has always been that a public or private entity must adopt an available alternative to a policy or practice that has discriminatory effect, so long as the alternative can satisfy the entity's legitimate needs with less discriminatory effect. This rule does not require a business to sacrifice legitimate needs, like a bank's need to accurately assess the likelihood that an applicant will repay a mortgage loan; it only requires the bank to base policies on legitimate needs and meet them in the least discriminatory manner reasonably available. It does not require banks to ignore relevant considerations like unequal incomes or credit scores; it only requires a company to avoid considerations that disproportionately harm members of protected classes unnecessarily.

7.      Through these longstanding requirements, disparate-impact law has been critical in reducing inequities affecting housing. It has ferreted out covert intentional discrimination, such as exclusionary zoning rules that effectively deny housing opportunities to persons of color. It has forced companies to jettison policies based on unexamined assumptions, or "disguised animus," *Inclusive Communities*, 576 U.S. at 540, that is often difficult to identify. And it has caused lenders and others that predict risk using models that incorporate many variables to search for and implement the precise variable combinations that predict accurately *and* minimize disparate outcomes. In doing so, responsible businesses have come to recognize that incorporating disparate-impact law into their operations is good for business because it helps them to find more qualified customers in all communities without regard to race, color, or national origin. With the growing role of complex machine-learning models and artificial intelligence in all aspects of everyday life, this is especially important to avoid the unnecessary perpetuation of discrimination, segregation, and inequality going forward.

8.      The new rule undermines disparate impact's ability to accomplish all this by eliminating the requirement that a defendant explore less discriminatory alternatives to policies that have a significant, adverse disparate impact on communities of color. This has long been the key to success in reducing disparities caused by rules, laws, policies and models that perpetuate structural racism.

9.      HUD's Final Rule upends settled disparate-impact jurisprudence in other important other ways as well, by imposing new pleading requirements for Fair Housing Act claims alleging disparate impact, dramatically increasing plaintiffs' evidentiary burdens while decreasing those placed on defendants, and creating new defenses from whole cloth. The new pleading requirements will be impossible to meet, and the defenses impossible to overcome, in many if not most instances, meaning that important and meritorious cases will never even be filed. The Final Rule also requires disparate-impact administrative complaints filed with HUD to meet the pleading standards for a federal-court complaint, destroying the utility of that forum.

10.      HUD purports to justify the Final Rule's sweeping changes by asserting that they are required in order to implement the Supreme Court's 2015 *Inclusive Communities* decision. That is baseless. *Inclusive Communities* upheld and affirmed existing disparate-impact law and spoke approvingly of its history. The Court explained that "disparate-impact liability has always been properly limited in key respects." *Inclusive Communities*, 576 U.S. at 521. Nothing in the opinion suggests that the law required narrowing, much less must be radically altered as HUD does in the Final Rule.

11.      Plaintiffs National Fair Housing Alliance ("NFHA"), Fair Housing Advocates of Northern California ("FHANC"), and BLDS, LTD ("BLDS") will be significantly harmed by the Final Rule. NFHA also brings this suit on behalf of its members, which will be significantly harmed as well.

12.      NFHA is a membership organization that combats discrimination in housing across the country. It works with banks, insurers, and others that affect the housing market to encourage and, when necessary, require their modification of policies to avoid unnecessary discriminatory impact. NFHA relies on disparate-impact law to succeed. Companies have an incentive to cooperate with NFHA because they know they may otherwise face liability pursuant to a disparate-impact complaint

1    filed with HUD or in federal court. That incentive will be gone or largely curtailed because of the Final

2    Rule. This will directly impede NFHA's ability to accomplish its mission. Moreover, NFHA has

3    already had to divert substantial resources to counteract HUD's actions by advocating for companies to

4    continue, voluntarily, to identify and adopt the least discriminatory policies consistent with their

5    business needs notwithstanding the Final Rule. NFHA is also injured by the Final Rule because it has

6    invested in technology that will allow companies to test their predictive models for discriminatory

7    impact and, where found, determine whether less discriminatory alternatives are available. The

8    effectiveness of this "debiasing sandbox" will be much reduced because companies will no longer be

9    incentivized to use it by the prospect of disparate-impact liability.

10          13.      NFHA's member organizations share in the mission of combating discrimination in

11   housing. They often utilize the HUD administrative complaint process to challenge policies with

12   disparate impact. That process, until now, has been less costly to use than courts and has allowed

13   members to increase inclusive housing opportunities for all protected classes. The Final Rule, however,

14   substantially reduces its availability to NFHA members. NFHA members have complaints currently

15   pending which will be subject to these additional requirements and now have a greatly reduced chance

16   of success. Going forward, they will need to devote more resources to pre-filing investigations to meet

17   the heightened pleadings standards, if they can be met at all, meaning they will be able to challenge

18   fewer discriminatory practices.

19          14.      FHANC is a NFHA member organization that operates in Northern California. FHANC

20   conducts a range of activities to protect the fair housing rights of its clients and community. These

21   include counseling, education programs, training, advocacy with housing providers and others, filing

22   administrative complaints with HUD, and litigating. Like NFHA and other NFHA members, FHANC

23   relies on disparate-impact law to succeed in achieving its goals and furthering its mission. The

24   effectiveness of its fair housing programs will be significantly impaired by the Final Rule because

25   victims of discrimination will have fewer enforceable rights and housing providers and others that

26   maintain unnecessarily discriminatory policies will face little risk of penalty for non-compliance. In

27   each part of its operations, FHANC will have to expend more staff time and funds than previously,

28

- 4 -

COMPLAINT
National Fair Housing Alliance, Fair Housing Advocates of Northern California, and BLDS, LTD d/b/a BLDS, LLC v. Ben Carson and U.S. Department
of Housing and Urban Development

1  leaving it able to serve fewer members of the community. FHANC's ability to protect the fair housing

2  rights of its community will be diminished, and its community will be subjected to more fair housing

3  violations, if the Final Rule remains in effect.

4       15.     BLDS is a leading consulting firm that assists lenders and others in conducting

5  statistical analyses to determine whether their policies related to housing disparately impact members

6  of protected classes and, if so, whether alternative policies would satisfy their legitimate needs while

7  mitigating that impact. The Final Rule sharply curtails, or even outright eliminates, risk to BLDS's

8  clients of disparate-impact liability, meaning they will no longer require the same services from BLDS.

9  This will directly reduce or eliminate a substantial source of revenue for BLDS. It will also

10  substantially diminish the value of investments BLDS has made in recent years to create proprietary

11  methods and tools for analyzing models for fair lending risk.

12       16.     HUD issued its rule changing decades-old law regarding disparate impact without

13  reasoned explanation, without responding adequately to comments submitted regarding the proposed

14  rule, without even first publishing certain provisions for comment, and in contravention of the Act's

15  fundamental purpose. HUD's action violates the APA for multiple reasons, including because it is

16  arbitrary and capricious, an abuse of discretion, not in accordance with law, and in excess of HUD's

17  statutory grant of authority, and was taken without observance of procedures required by law. HUD's

18  Final Rule should be vacated and set aside.

19                                   **PARTIES**

20       17.     The National Fair Housing Alliance (NFHA), a non-profit and public service

21  organization, is a nationwide consortium of private non-profit fair housing organizations, legal services

22  groups, and other organizations. It has operating and supporting members located in every state,

23  including in California, where it has multiple members, including Plaintiff Fair Housing Advocates of

24  Northern California. NFHA's mission is to promote residential integration and to combat

25  discrimination in housing based on race, national origin, disability, and other protected classes covered

26  by federal, state, and local fair housing laws. NHFA is incorporated under the laws of the

27  Commonwealth of Virginia with its principal place of business in Washington, DC.

28

COMPLAINT
National Fair Housing Alliance, Fair Housing Advocates of Northern California, and BLDS, LTD d/b/a BLDS, LLC v. Ben Carson and U.S. Department
of Housing and Urban Development

18.     Plaintiff FHANC is a nonprofit fair housing corporation incorporated under the laws of California with its principal place of business in San Rafael, California.

19.     Plaintiff BLDS, LTD d/b/a BLDS, LLC (BLDS) is a nationally recognized firm of statistics and economics experts. Among the core services BLDS provides is statistical analysis of the discriminatory effects of policies and practices and identification of available alternatives that would ameliorate any discriminatory effects. BLDS is incorporated under the laws of Delaware with its principal place of business in Philadelphia, Pennsylvania.

20.     Defendant U.S. Department of Housing and Urban Development (HUD) is an agency of the United States within the meaning of the APA. HUD is charged with administering and enforcing the Fair Housing Act, including by accepting and adjudicating administrative complaints of violations.

21.     Defendant Ben Carson is the Secretary of HUD and is sued in his official capacity.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over this matter under 28 U.S.C. § 1331 and 5 U.S.C. § 702.

23.     Venue is proper in this District under 28 U.S.C. § 1391(e) and 5 U.S.C. § 703 because a substantial part of the events giving rise to these claims occurred in this District and because Plaintiff FHANC is a resident of this District.

24.     Intradistrict assignment in the San Francisco Division or Oakland Division is proper under Civil Local Rule 3.2(c) because a substantial part of the events giving rise to the claims occurred in Marin County.

## FACTUAL ALLEGATIONS

I.     **The Fair Housing Act's Prohibition Against Housing Policies with Unnecessary Disparate Impact Has Been Central to the Act's Effectiveness in Combating Stark Racial Disparities**

A.     **Structural Inequalities with Respect to Race Remain Deeply Embedded in Our Country**

25.     Racism and racial segregation are woven into this country's fabric, and overtly discriminatory housing policies and practices have been among the main causes. Such discrimination has ranged from official government redlining to enforce housing segregation, to comparable private

1    policies like racial steering by realtors and racially restrictive covenants, to widespread racism that has

2    been manifested in countless other ways.

3        26.    Though overt discrimination was belatedly banned, its legacy—deeply engrained

4    inequality of opportunity and enduring disparities between Black and white—endures. The dramatic

5    and persistent difference in homeownership is emblematic. Throughout the fifty-two years since

6    Congress enacted the Fair Housing Act, the Black homeownership rate has remained under 50 percent

7    while the white homeownership rate has always been significantly higher, now exceeding 75 percent.

8    Indeed, the racial homeownership gap is now wider than it was when the Act became law.[1]

9        27.    In large part because Black people have been shut out of homeownership, this country's

10   primary driver of wealth creation, the racial wealth gap is even starker. As of 2016, the median white

11   family had about $171,000 in accumulated wealth, while the median Black family had barely one-tenth

12   as much, $17,150.[2] Without accumulated wealth, Black families are stymied in attaining

13   homeownership, and so they continue to be denied the opportunity to accumulate wealth. It is a vicious

14   cycle.

15       28.    The same is true of neighborhoods; government-sponsored segregation may be gone,

16   but its effects are not. Neighborhoods that are predominantly Black today track those that the federal

17   government redlined, and many continue to lack the opportunities available in white neighborhoods. In

18   San Francisco and Oakland, as in much of the country, neighborhoods that the government once

19   deemed "hazardous" because of their racial demographics remain highly segregated today. *See* Stephen

20   Menendian & Samir Gambhir, Othering & Belonging Institute at Univ. of Cal. Berkeley, Racial

21   Segregation in the San Francisco Bay Area, Part 1 (2018), https://belonging.berkeley.edu/racial-

22   segregation-san-francisco-bay-area; Robert K. Nelson, et al., Mapping Inequality: Redlining in New

23   Deal America, *American Panorama*, ed. Robert K. Nelson and Edward L. Ayers, accessed Oct. 21,

24

25   _____

26   [1] Caitlin Young, These Five Facts Reveal the Current Crisis in Black Homeownership, Urban Institute (July 31, 2019), https://www.urban.org/urban-wire/these-five-facts-reveal-current-crisis-black-homeownership.

27   [2] Kristin McIntosh et al., Examining the Black-white Wealth Gap, Brookings (Feb. 27, 2020), https://www.brookings.edu/blog/up-front/2020/02/27/examining-the-black-white-wealth-gap/.

28

1 2020, https://dsl.richmond.edu/panorama/redlining/#loc=12/37.758/-122.53&city=san-francisco-

2 ca.  These same historically redlined Bay-area communities are marked by higher rates of pollution

3 and suffer the consequent health risks at higher rates than neighboring areas. Kara Manke, Univ. of

4 Cal. Berkeley, Historically Redlined Communities Face Higher Asthma Rates (May 22, 2019),

5 https://vcresearch.berkeley.edu/news/historically-redlined-communities-face-higher-asthma-rates. The

6 "vestiges [of *de jure* segregation by race] remain today, intertwined with the country's economic and

7 social life." *Inclusive Communities*, 576 U.S. at 528.

8        29.     This longstanding residential segregation means Black and white people largely

9 continue to live apart, in different neighborhoods that are far from equivalent. Outside largely white

10 neighborhoods, high-performing schools are less common, unemployment and poverty are higher,

11 health is worse (as the coronavirus pandemic has most recently made plain), access to financial

12 institutions remains inadequate, and the list goes on. These neighborhoods are also much likelier to be

13 targeted by unscrupulous companies, such as disreputable lenders targeting Black homeowners with

14 equity-stripping mortgage schemes.[3]

15        30.     Vast disparities in how Black and white communities have experienced the current

16 coronavirus pandemic provide just the latest example of how our long legacy of residential segregation

17 and racial discrimination lead to unequal results today. In California, for example, Black people are 1.5

18 times more likely to contract COVID-19 than white people,[4] and once people who live in formerly

19 redlined neighborhoods contract the disease, they are likelier to die of it than those who live

20

21

22

23

24 _____

25 [3] Jury Verdict Form, ECF No. 518, *Saint-Jean, et al. v. Emigrant Mortgage Co.*, 337 F. Supp. 3d 186 (E.D.N.Y. 2016) (No. 11-2122).

26 [4] Tracking the Coronavirus in California, Los Angeles Times (Updated Oct. 19, 2020 9:51 A.M.),
https://www.latimes.com/projects/california-coronavirus-cases-tracking-outbreak/#who-has; Rong-Gong Lin II, California

27 Latino, Black residents hit even harder by coronavirus as white people see less danger, Los Angeles Times (June 27, 2020),
https://www.latimes.com/california/story/2020-06-27/california-latinos-black-people-hit-even-harder-by-coronavirus

28

COMPLAINT
National Fair Housing Alliance, Fair Housing Advocates of Northern California, and BLDS, LTD d/b/a BLDS, LLC v. Ben Carson and U.S. Department
of Housing and Urban Development

1    elsewhere.[5] The result is that Black Americans are dying from COVID-19 at rates 3.6 times higher

2    than are white Americans.[6]

3    **B.      Congress Intended the Fair Housing Act to Combat Structural Inequalities**

4           31.     Congress enacted the Fair Housing Act in 1968 to address such longstanding structural

5    inequalities. Earlier that year, the Kerner Commission warned that discriminatory practices and

6    inequities like those described above were producing "two societies, one black, one white—separate

7    and unequal." *Inclusive Communities*, 576 U.S. at 529 (quoting Report of the National Advisory

8    Commission on Civil Disorders 91 (1968)). The Commission found that "residential segregation and

9    unequal housing and economic conditions" were central to this "deepening racial division." *Id.* As the

10   Supreme Court explained, it was to address these problems that Congress followed the Kerner

11   Commission's recommendation and passed the Fair Housing Act. *Id.* Consistent with the scope of the

12   problem, the Act sweepingly codified "the policy of the United States to provide, within constitutional

13   limitations, for fair housing throughout the United States." 42 U.S.C. § 3601.

14          32.     To carry out such a policy in the face of the long history of official and unofficial

15   racism in housing and its persistent legacy, the Fair Housing Act necessarily must do more than ban

16   intentionally discriminatory acts. As the Supreme Court recognized in the employment context at the

17   time—and as it later recognized with respect to the Fair Housing Act—"practices, procedures, or tests

18   neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to

19   'freeze' the status quo of prior discriminat[ion]." *Griggs v. Duke Power Co.*, 401 U.S. 424, 430 (1971).

20   Housing policies, like employment policies, do not need to be stated in terms of race to reinforce or

21   reproduce historic disparities. And often it is uncertain, or difficult to prove, that anyone has acted with

22   discriminatory intent in adopting or maintaining them. So the Supreme Court agreed, finding that

23   "[r]ecognition of disparate-impact claims is consistent with the FHA's central purpose . . . . to

24

25

26   _____

     [5] Cristina Kim, New Study Finds Formerly Redlined Neighborhoods Are More At Risk For COVID-19, WBUR (Sept. 14,
27   2020), https://www.wbur.org/hereandnow/2020/09/14/redlined-neighborhoods-coronavirus-study

     [6] *Id.*
28

COMPLAINT
National Fair Housing Alliance, Fair Housing Advocates of Northern California, and BLDS, LTD d/b/a BLDS, LLC v. Ben Carson and U.S. Department
of Housing and Urban Development

1    eradicate discriminatory practices within a sector of our Nation's economy," *i.e.*, housing. *See*

2    *Inclusive Communities*, 576 U.S. at 539.

3        33.    Accordingly, since the Fair Housing Act's early days, courts have consistently held that

4    the Fair Housing Act permits claims challenging policies with unnecessary discriminatory effect. *See,*

5    *e.g., United States v. City of Black Jack, Missouri*, 508 F.2d 1179 (8th Cir. 1974). For decades, policies

6    that have a significant and unnecessary discriminatory effect on the availability or terms of housing

7    based on race or other protected class have been unlawful.

8        34.    The touchstone of the disparate-impact doctrine has always been the requirement to

9    adopt an available alternative that can accomplish a policy's legitimate ends with less discriminatory

10   impact. Accordingly, even when legitimate reasons are proffered for policies that have discriminatory

11   effects, the Fair Housing Act requires that if there are less discriminatory ways to achieve those

12   legitimate ends, they must be adopted. This rule applies both to official policies with unnecessary

13   discriminatory impact (such as zoning decisions), and to private industry policies (such as mortgage

14   lending or property insurance policies) that have the effect of excluding people from housing

15   opportunities in a discriminatory way.

16       35.    The Act provides that those victimized by policies with unnecessary discriminatory

17   effect may bring a disparate-impact claim in court or before HUD. Such a claim has always proceeded

18   in three basic steps. First, a plaintiff must demonstrate that a policy causes or predictably will cause a

19   disparate impact based on race or other protected class. If the plaintiff meets that burden, the defendant

20   then must show the policy is necessary to achieve a legitimate purpose. Finally, if the defendant does

21   so, the plaintiff must show the defendant's legitimate ends could be served by a less discriminatory

22   alternative policy. If the plaintiff makes that last showing, the Fair Housing Act requires adoption of

23   the less discriminatory alternative. By thus requiring the refinement of unnecessarily discriminatory

24   policies, disparate-impact doctrine assures everyone a fair opportunity to obtain housing and related

25   services while preserving the ability of governments and businesses to meet their needs. Taken

26   together, the Supreme Court explained, these three steps have always functioned as "safeguards" so

27   that "solely . . . 'artificial, arbitrary, and unnecessary barriers'" are removed. *Inclusive Communities*,

28

COMPLAINT
National Fair Housing Alliance, Fair Housing Advocates of Northern California, and BLDS, LTD d/b/a BLDS, LLC v. Ben Carson and U.S. Department
of Housing and Urban Development

1    576 U.S. at 544 (quoting *Griggs*, 401 U.S. at 431). Those are the very types of barriers frequently

2    presented by structural inequalities that are the persistent legacy of the county's history of

3    discrimination.

4          **C.      Disparate Impact Has Been Central to Addressing Housing Inequalities**

5          36.      Disparate-impact doctrine has been vital to the Fair Housing Act's success over the last

6    half century. It has driven many important policy changes that have made our society fairer and less

7    segregated—often while making the policies that are changed *better* at achieving their legitimate ends.

8    Broadly speaking, disparate impact has furthered Congress' purpose of "eradicat[ing] discriminatory

9    practices" in housing, *Inclusive Communities*, 576 U.S. at 539, in three fundamental ways: (1)

10   uncovering hidden intentional discrimination; (2) requiring scrutiny of unfounded policies or practices

11   that, as applied, operate to perpetuate discrimination; and (3) requiring lenders and others to

12   continually improve and refine dynamic decision models and policies to minimize unequal outcomes.

13   Today, disparate impact takes on even greater importance in ensuring that decisions made with the

14   next generation of artificial-intelligence-based, machine-learning tools and platforms are non-

15   discriminatory.

16                  ***i.      Disparate Impact Ferrets Our Covert Intentional Discrimination***

17         37.      Disparate-impact doctrine ferrets out continuing intentional discrimination that is not

18   overtly expressed. In *Inclusive Communities*, the Supreme Court recognized this important role: "It

19   permits plaintiffs to counteract unconscious prejudices and disguised animus that escape easy

20   classification as disparate treatment. In this way disparate-impact liability may prevent segregated

21   housing patterns that might otherwise result from covert and illicit stereotyping." 576 U.S. at 540.

22   With many having learned to hide their discriminatory intent, it is critical that a disparate-impact claim

23   triggers further scrutiny where the evidence of a policy's discriminatory effect is stark and the

24   justification for the policy thin or non-existent.

25         38.      One of the earliest uses of disparate-impact doctrine under the Fair Housing Act

26   addressed this type of situation. In 1970, the almost all-white city of Black Jack, Missouri adopted an

27   ordinance prohibiting the construction of multi-family dwellings. This policy, although race-neutral on

28

COMPLAINT
National Fair Housing Alliance, Fair Housing Advocates of Northern California, and BLDS, LTD d/b/a BLDS, LLC v. Ben Carson and U.S. Department
of Housing and Urban Development

1   its face, had the effect of excluding Black people, who largely could not afford single-family homes in

2   the area. As the Eighth Circuit found, "[t]he ultimate effect of the ordinance was to foreclose 85

3   percent of the blacks living in the metropolitan area from obtaining housing in Black Jack, and to

4   foreclose them at a time when 40 percent of them were living in substandard or overcrowded

5   units." *Black Jack*, 508 F.2d at 1186. The evidence developed in the case showed that the policy was

6   unnecessary to further any of the City's stated justifications, such as addressing concerns related to

7   traffic, school overcrowding, and property values. *Id.* at 1187.

8         39.    More recently, but all too similarly, an all-white parish bordering New Orleans adopted

9   an ordinance in the aftermath of Hurricane Katrina limiting housing rentals to blood relatives of the

10   owners—thus excluding any renter without (white) family already living in the parish—and then

11   placed a moratorium on the construction of all multi-family housing. *See, e.g., Greater New Orleans*

12   *Fair Hous. Action Center v. St. Bernard Parish*, 641 F. Supp. 2d 563, 565-66 (E.D. La. 2009). That

13   moratorium had a disparate impact based on race because it prevented the construction of the housing

14   most likely to be used by Black families from the neighboring lower ninth ward of New Orleans, and

15   thus prevented them from moving to the parish. *Id.* at 568. As in *Black Jack*, the disparate impact

16   analysis in the *St. Bernard* litigation revealed that the Parish's stated justifications for its policies were

17   unsupported and that, in fact, the Parish's intent in enacting them was racially discriminatory. *Id.* at

18   577-78.

19             *ii.*    **Disparate-Impact Doctrine Forces the Examination of Unfounded**
20                  **Assumptions**

21         40.    Disparate impact has lessened structural inequalities in industries with long histories of

22   overt discrimination like home lending, property insurance, and rental housing, because it forces

23   careful examination of assumptions used to justify policies. Many policies with stark discriminatory

24   effects are based on deeply entrenched but unexamined assumptions. Often these are rooted in

25   subconscious bias and influenced by the country's long history of intentional, institutionalized

26   discrimination and housing segregation. *See, e.g.*, The Nat'l Comm'n on Fair Hous. & Equal

27   Opportunity, The Future of Fair Housing: Report of the National Commission on Fair Housing and

28

COMPLAINT
National Fair Housing Alliance, Fair Housing Advocates of Northern California, and BLDS, LTD d/b/a BLDS, LLC v. Ben Carson and U.S. Department
of Housing and Urban Development

1  Equal Opportunity 6-9 (2008), https://lawyerscommittee.org/wp-content/uploads/2015/08/The-Future-

2  of-Fair-Housing-National-Commission-on-Fair-Housing-and-Equal-Opportunity.pdf (summarizing

3  some of this history). The lending and homeowners' insurance industries, for example, which spent

4  decades redlining majority-Black neighborhoods, developed standards and procedures that do not

5  necessarily assess property or creditworthiness accurately.

6      41.    Present-day actors, sometimes without awareness that they are doing so, perpetuate past

7  discrimination through requirements and processes that have unnecessary adverse impact on

8  communities of color. They may believe their methods are sound and their results non-discriminatory

9  until confronted with evidence of unjustified discriminatory impact. *See, e.g.*, Kenneth Temkin, et al.,

10 Inside A Lender: A Case Study Of The Mortgage Application Process, *in* Mortgage Lending

11 Discrimination: A Review of Existing Evidence 145-149 (Margery Austin Turner and Felicity

12 Skidmore eds., 1999), http://webarchive.urban.org/UploadedPDF/mortgage_lending.pdf (describing

13 lender whose staff genuinely believed in commitment to fair lending and non-discrimination, but that

14 nonetheless rejected non-white loan applicants disproportionately).

15     42.    For example, many lenders refused for years to make home loans for row houses. This

16 policy had a stark discriminatory effect based on race because row houses are found largely in urban

17 areas with a significant non-white population. Lenders adopted this policy because, in a limited

18 number of areas, row houses had been the subject of fraudulent appraisals that facilitated "flipping" at

19 inflated prices. Inexperienced homebuyers were targeted by predatory sellers and found themselves

20 stuck with purportedly renovated dwellings that proved uninhabitable. *See, e.g.*, *Predatory Lending:*

21 *Joint Hearing Before a Subcommittee of the Committee on Appropriations*, 107th Cong. (2001),

22 https://www.govinfo.gov/content/pkg/CHRG-107shrg85218/pdf/CHRG-107shrg85218.pdf.

23     43.    That a few row houses had been the subject of such fraud (which could have been

24 perpetrated with other homes) did not justify the categorical exclusion of *all* row houses from

25 eligibility for home loans. Yet many lenders simply assumed it did (in part due to bias, conscious or

26 unconscious, about those living in row houses), and they adopted corresponding blanket bans, thus

27 excluding many qualified customers who were disproportionately Black from obtaining home loans.

28

- 13 -

COMPLAINT
National Fair Housing Alliance, Fair Housing Advocates of Northern California, and BLDS, LTD d/b/a BLDS, LLC v. Ben Carson and U.S. Department of Housing and Urban Development

1    Even after the fraudulent appraisal issue was resolved in the few areas where it was a problem, lenders

2    failed to reexamine the policy. Only when faced with administrative litigation before HUD based on

3    disparate impact did they agree to drop their no-row-houses policies. *See, e.g.*, U.S. Dep't of Hous. &

4    Urban Dev., HUD Announces $100,000 Settlement Of Fair Lending Complaint Against First Indiana

5    Bank, N.A. (June 4, 2007), http://archives.hud.gov/news/2007/pr07-080.cfm.

6       44.    The disparate-impact doctrine has required the same type of scrutiny within the property

7    insurance industry. Even after the Fair Housing Act banned redlining policies that denied insurance to

8    homeowners in predominantly Black communities, the industry for many years adopted, and then

9    refused to re-examine, policies that produced the same discriminatory effect. When pressed to justify

10   these policies as necessary to achieve their stated purposes, the unsupported assumptions upon which

11   they were based came to light.

12      45.    For example, property insurers would refuse to insure homes worth less than a certain

13   amount, or homes of a certain age. These arbitrary exclusions disproportionately rendered homes in

14   majority-Black neighborhoods uninsurable. *See, e.g., Toledo Fair Hous. Ctr v. Nationwide Mut. Ins.*

15   *Co.*, 704 N.E.2d 667, 674 (Ct. C.P. Ohio 1997) (describing evidence showing that minimum-value

16   requirement excluded 83 percent of homeowners in majority-Black neighborhoods, compared with 31

17   percent in white neighborhoods). Or property insurers would refuse to insure homes valued at less than

18   the estimated cost to rebuild them, on the assumption that the owners of such homes would burn them

19   down, thus effectively redlining predominantly minority neighborhoods where the appraised value of

20   homes tends to be lower. *See* Gregory D. Squires, *Racial Profiling, Insurance Style: Insurance*

21   *Redlining And The Uneven Development Of Metropolitan Areas*, 25 J. of Urban Aff. 391, 400 (2003).

22      46.    To remedy such discriminatory practices, plaintiff NFHA and others brought disparate-

23   impact claims under the Fair Housing Act. *See, e.g., Nat'l Fair Hous. All. v. Prudential Ins.*, 208 F.

24   Supp. 2d 46 (D.D.C. 2002). Once pressed to provide evidence in litigation, insurers could not

25   demonstrate the actuarial necessity for these policies. Rather, they had simply maintained unsupported

26   categorical exclusions that tracked their prior overt exclusion of the same neighborhoods from

27   coverage.

28

COMPLAINT
National Fair Housing Alliance, Fair Housing Advocates of Northern California, and BLDS, LTD d/b/a BLDS, LLC v. Ben Carson and U.S. Department
of Housing and Urban Development

47.     Once it was clear they faced legal risk for maintaining practices with an unjustified discriminatory impact, many insurance companies began scrutinizing their previously unexamined policies more closely. They worked with NFHA and others to make their policies more inclusive. When they did, some of their stated concerns proved entirely unfounded, and others could be addressed in less discriminatory ways. Instead of categorically excluding older homes, property insurers found they could require more rigorous inspection of older heating, plumbing, and electrical systems. This alternative satisfied their legitimate needs without categorically excluding whole neighborhoods.

48.     As a HUD official stated in announcing one settlement, policy changes stemming from the application of disparate impact to the insurance industry provide an "example of how the Fair Housing Act works to benefit all Americans." HUD, HUD Commends Settlement Of Case Against Nationwide Insurance (Mar. 10, 1997), https://archives.hud.gov/news/1997/pr97-27.cfm.

49.     Disparate impact continues to drive inclusiveness in the property insurance industry. As policies that unnecessarily exclude people in protected classes from housing opportunities are identified, NFHA and its allies work with the industry to voluntarily change them. If that fails, NFHA and others file claims with HUD or in court and put the industry to the test of showing that these exclusionary policies serve legitimate purposes that could not be served in a less discriminatory way— scrutiny that these policies often cannot survive. *See, e.g.*, *Nat'l Fair Hous All. v. Travelers Indem. Co.*, 261 F. Supp. 3d 20 (D.D.C. 2017) (insurance company refused to insure residential properties that rented to Section 8 voucher users, thus coercing property owners into refusing to rent to them and eliminating housing opportunities for predominantly Black population); *Viens v. Am. Empire Surplus Lines Ins. Co.*, No. 14-cv-952, 2015 WL 3875013 (D. Conn. June 23, 2015) (same); *Jones v. Travelers Casualty Ins.  Co.*, No.  13-cv-02390, 2015 WL 5091908 (N.D. Cal. May 7, 2015) (same).[7]

---

[7] Many more examples exist of such unjustified restrictions. *See, e.g.*, Stephen M. Dane, *Race Discrimination Is Not Risk Discrimination: Why Disparate Impact Analysis Of Homeowners Insurance Practices Is Here To Stay*, 33 No. 6 Banking & Fin. Servs. Pol'y Rep. 1, 4 (2014) (collecting examples of insurance practices based not on "careful, statistical studies[,]" but rather on "subjective stereotypes about classes of consumers and types and geographic location of property").

50.     Disparate impact has forced housing providers, too, to refine overbroad exclusions that have had unnecessary discriminatory effects on tenants and would-be tenants. For example, with consistent support from HUD, disparate impact has barred overly restrictive apartment occupancy limits, which have the effect of unnecessarily barring families with children. *See*, *e.g.*, Department of Housing and Urban Development's Fair Housing Enforcement—Occupancy Standards; Notice of Statement of Policy, 63 Fed. Reg. 70982-70987 (Dec. 22, 1998). It has forced landlords to reconsider requirements that applicants have full-time employment, which have the effect of unnecessarily barring many people with disabilities. And it has forced landlords to reconsider overly broad criminal-history restrictions, which have the effect of disproportionately excluding Black would-be tenants, who are more likely to have arrests or convictions on their records that have nothing to do with fitness for tenancy due to continuing systemic racism in policing and the criminal justice system.

51.     By forcing the key players in the housing markets to justify policies with discriminatory effects—and forcing them to change those policies if they cannot do so—disparate impact has helped to reduce structural inequalities that continue to disadvantage communities of color.

   iii.   ***Disparate Impact Drives Innovation and Improvements That Make Policies and Models More Effective and Fair***

52.     Disparate impact has reduced disparities in ways more profound than the modification of individual policies; it has changed the ongoing processes by which many lenders and other entities create and maintain the models they use to make loans or otherwise decide who gets to participate in the housing market. Lenders often combine numerous variables in models to predict an applicant's creditworthiness or risk of default. Different combinations of variables may predict risk with comparable effectiveness, yet some disproportionately exclude members of protected classes to a greater degree than others. Because of disparate impact, responsible lenders and financial institutions now identify and implement the least discriminatory models consistent with their need for accuracy in predicting risk. *See* Ex. A, Decl. of J. Jaffee (Oct. 19, 2020) at ¶¶ 11-14.

53.     These advances would not have come to pass absent an incentive structure requiring lenders and others to revisit policies that have discriminatory effects and modify those that are

1    unnecessary to achieve legitimate ends. Knowing they risk liability from both private litigants and

2    federal regulators, many of the major players that shape the availability and terms of housing have

3    adopted compliance systems to make their policies fairer. Once required to adopt less discriminatory

4    alternatives, companies frequently have found that such alternatives cost them little if any profits and

5    may even increase profits by helping them find new customers and be more precise about the lines

6    they draw to exclude people. Disparate impact created and maintains that structure. *See id.* at ¶¶ 10, 12,

7    14-15, 17, 19-21.

8         54.    One of the important ways disparate impact has reduced systemic structural inequalities

9    in this manner can be seen in the improvements made to automated underwriting models that the

10   Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage

11   Corporation ("Freddie Mac") use to evaluate home loan applications.

12        55.    Fannie Mae's and Freddie Mac's introduction of automated underwriting systems was a

13   great innovation in lending because it permitted lenders to originate loans based on objective rather

14   than subjective criteria, but they initially used criteria under which comparatively few Black borrowers

15   were approved. Under pressure to do better or face disparate-impact liability from federal regulators,

16   Fannie Mae and Freddie Mac worked with experts such as Dr. Bernie Siskin of Plaintiff BLDS to

17   make their methodologies both fairer and more accurate. Between 1995 and 2000, the percentage of

18   Black borrowers approved by Loan Prospector—Freddie Mac's automated underwriting system—

19   increased from 23 percent to 54 percent, while minority-owned home loans increased from 8.5 percent

20   of those Freddie Mac purchased in 1995 to 14.9 percent in 2000. *See* Susan Wharton Gates et al.,

21   *Automated Underwriting in Mortgage Lending: Good News For The Underserved?*, 13 Hous. Policy

22   Debate 369, 380-82 (2002). In the process, Loan Prospector became *more* accurate at predicting risk.

23   *Id.* It turned out that, upon closer review, it was possible to make underwriting far more inclusive while

24   not sacrificing the ability to achieve any legitimate end.

25        56.    As an example of how Fannie Mae's original rules were unnecessarily restrictive, its

26   initial matrix favored those who consistently made mortgage payments, giving no credit to those who

27   consistently make other monthly payments, such as rent. This policy favored people who could buy

28

- 17 -

COMPLAINT
National Fair Housing Alliance, Fair Housing Advocates of Northern California, and BLDS, LTD d/b/a BLDS, LLC v. Ben Carson and U.S. Department
of Housing and Urban Development

1    homes previously, recreating the discrimination of past housing policies. Incentivized by disparate-

2    impact requirements to look for less discriminatory variables to use in its automated underwriting

3    models, Fannie Mae now employs a more inclusive model that permits lenders to look at a prospective

4    borrower's history of rental payments in combination with many other variables. This allows those

5    without mortgage payment history—disproportionately people of color—to demonstrate their

6    creditworthiness. *See* Fannie Mae, *Selling Guide: B3-5.4-03, Documentation and Assessment of a*

7    *Nontraditional Credit History* (last revised Aug. 30, 2016), https://selling-

8    guide.fanniemae.com/Selling-Guide/Origination-thru-Closing/Subpart-B3-Underwriting-

9    Borrowers/Chapter-B3-5-Credit-Assessment/Section-B3-5-4-Nontraditional-Credit-

10    History/1032991091/B3-5-4-03-Documentation-and-Assessment-of-a-Nontraditional-Credit-History-

11    08-30-2016.htm.

12          57.    Thus, due to the Fair Housing Act's disparate-impact doctrine, some lenders have gone

13    from reliance on judgmental assessments of potential borrowers frequently infected by bias or

14    stereotypes (whether knowingly or otherwise) to use of sophisticated statistical analyses to produce

15    policies that are both less discriminatory *and* more predictive of risk. As a result, many lenders now

16    are better at identifying qualified borrowers in all neighborhoods, without sacrificing the legitimate

17    business need to identify real risk.

18          58.    Disparate-impact doctrine has also given important entities in the housing market,

19    advocates such as Plaintiff NFHA, and consultants such as Plaintiff BLDS a shared vocabulary to

20    assess the propriety of policies that influence the availability and terms of housing, without charging

21    anyone with discriminatory intent and with the goal of constructive solutions. It has done so by

22    requiring a singular focus on the search for less discriminatory alternatives—the touchstone of

23    disparate impact—that produce fairer policies and models without sacrificing business goals, needs,

24    and interests.

25

26

27

28

**D.    A Robust Disparate-Impact Doctrine Is Vital to Ensuring the Fairness of the Next Generation of Automated Policies that Rely on Machine Learning and Artificial Intelligence**

59.    The importance of disparate impact has increased with technological advances. The introduction of artificial intelligence and machine-learning models in recent years has brought new computing power and complexity to the decision-making process for many players in the housing industry.

60.    Today's lenders and insurers can consider a vast number of alternatives for their models and systems. As the information available to them about customers and potential customers has grown, and as more powerful computing systems are brought to bear, they now may choose from a large number of potential variables and model choices in underwriting and other aspects of their business.

61.    Entities are increasingly using artificial intelligence models to make predictive decisions regarding creditworthiness, marketing, and other key issues related to housing. These models assess the value of many variables, in countless combinations, in making predictions about, for example, the likelihood of someone defaulting on a loan.

62.    Because machine-learning models draw on a larger variety of data and rely on so many different variables, they offer a range of alternatives that can have very different levels of discriminatory effect while providing similar predictive power. If trained to do so, they can be used to make less discriminatory alternatives available for variables that have an unnecessary discriminatory effect. For example, they can avoid depending as heavily on a consumer's credit history, thus making home loans available to people of color who regularly pay their bills but have been historically denied credit because they disproportionately lack the history of credit payments that is typically used to build a good credit score.

63.    However, machine-learning models must be carefully and regularly evaluated to avoid recreating or exacerbating the discriminatory patterns that exist in society. For example, minority borrowers with high credit scores have disproportionately received subprime or higher cost products in the past, even when they qualified for prime credit. Models trained on this historical data can "learn"

- 19 -

COMPLAINT
National Fair Housing Alliance, Fair Housing Advocates of Northern California, and BLDS, LTD d/b/a BLDS, LLC v. Ben Carson and U.S. Department of Housing and Urban Development

1    that Black borrowers with high credit scores "should" nonetheless receive lesser-quality loans, and

2    otherwise will reflect and recreate these historical disparities.

3          64.     Moreover, machine-learning models can have a black-box quality that makes it difficult

4    for those harmed by them to determine why. Such models may rely on many variables, some of which

5    would not be obvious choices for a model builder but that nonetheless correlate to risk when selected

6    with the help of an algorithm. Adding further complexity, those variables often correlate to risk only in

7    combinations that, again, are obvious to the computer, but not to an underwriter.

8          65.     With the advent of artificial intelligence models and platforms, and the increasing use

9    being made of these new computer technologies by businesses large and small, the continuing

10   effectiveness of the Fair Housing Act's disparate-impact doctrine in providing the proper incentives is

11   of critical importance in ensuring that people of color and others in protected classes are not

12   unnecessarily excluded from housing opportunities. Disparate impact, as it has been applied until now,

13   requires that model builders and those who research new algorithmic models search for less

14   discriminatory alternatives. Failure to apply that requirement to this powerful new generation of

15   models will permit outcomes that worsen structural inequalities and perpetuate segregation.

16   **E.     Continuing the Application of Longstanding Rules of Disparate-Impact Law,
         Rather Than Upending Those Rules, Serves the Interests of Responsible**
17       **Companies That Have Incorporated Disparate Impact Analysis into Their Regular
         Operations**
18

19         66.     Responsible businesses have shown that incorporating traditional, well-established

20   disparate-impact analysis enables them to create fairer policies without sacrificing legitimate business

21   interests. Upsetting the longstanding rules of disparate-impact law would be harmful to those

22   businesses that have already done the work to make their policies more inclusive.

23         67.     The risk of disparate-impact liability incentivizes companies to internalize fair housing

24   principles and critically evaluate their own policies. Many have responded by institutionalizing

25   compliance mechanisms. They have invested in people and technology, designing protocols to

26   incorporate impact testing and awareness into their overall regulatory compliance regimes. The

27   consistency of the doctrine over decades has allowed and encouraged them to make these investments,

28

COMPLAINT
National Fair Housing Alliance, Fair Housing Advocates of Northern California, and BLDS, LTD d/b/a BLDS, LLC v. Ben Carson and U.S. Department
of Housing and Urban Development

1   because they can rely on the protocols they have developed without fear they will need to change them

2   from year to year. Sophisticated FHA compliance protocols and procedures are now the norm for many

3   leading lenders and housing market participants.

4       68.     When a new mortgage underwriting or pricing model is developed, for example, a bank

5   that has integrated traditional disparate-impact analysis into its compliance functions looks for

6   variables to include in its models that maximize predictiveness with the least discriminatory impact.

7   The same is true for criteria used in marketing campaigns.

8       69.     Any significant change to the rules governing disparate impact would throw decades of

9   compliance efforts into disarray. It therefore comes as no surprise that, as described below, leading

10  banks and lending institutions have spoken out in favor of preserving well-established disparate-impact

11  doctrine as beneficial for consumers and shareholders alike.

12  **II.    The 2013 HUD Rule and the Supreme Court's *Inclusive Communities* Decision Affirm
        Longstanding Disparate-Impact Doctrine**

13

14      70.     In 2011, HUD proposed a rule to formalize the longstanding disparate-impact doctrine.

15  It finalized this rule in February 2013 after receiving and considering comments. *See* Implementation

16  of the Fair Housing Act's Discriminatory Effects Standard, 78 Fed. Reg. 11460 (Feb. 15, 2013)

17  (codified at 24 C.F.R. § 100.500) ("2013 Rule").

18      71.     In the 2013 Rule, HUD codified the disparate-impact doctrine as it had applied for

19  decades. As HUD put it: "[T]his final rule embodies law that has been in place for almost four decades

20  and that has consistently been applied, with minor variations, by HUD, the Justice Department and

21  nine other federal agencies, and federal courts." *Id.* at 11462. Consistent with the longstanding

22  doctrine, HUD codified the three-part burden-shifting analysis described above. *Id.* at 11463.

23      72.     HUD did not purport to impose pleading standards in the 2013 Rule. Each of the

24  burdens it described applies at the proof stage, after an investigation by HUD or discovery in a federal-

25  court case.

26      73.     After the promulgation of the 2013 Rule, the Supreme Court granted certiorari on the

27  question of whether disparate-impact claims are available under the Fair Housing Act. It was also

28

1   presented with the question of what standards should apply to such claims, but it declined to review

2   that question.

3        74.    In 2015, in *Inclusive Communities*, the Supreme Court affirmed that the Fair Housing

4   Act bars practices with unnecessary discriminatory impact. Repeatedly referencing its seminal *Griggs*

5   decision finding disparate-impact employment claims available under Title VII of the Civil Rights Act,

6   the Court reasoned that the Fair Housing Act should function similarly. *Inclusive Communities*, 576

7   U.S. at 530-32. It also held that, when Congress expanded the reach of Fair Housing Act in 1988, it

8   ratified the disparate-impact doctrine, which by then was already well-established under the Act. *Id.* at

9   536-37. Finally, the Court observed that federal agencies and the lower courts had applied disparate

10   impact for decades, creating reliance interests that counseled against overruling the lower-court

11   consensus. *Id.* at 536, 546.

12        75.    *Inclusive Communities* repeatedly referenced HUD's 2013 Rule, as well as many cases

13   decided under the doctrine that the 2013 Rule codified, without suggesting that either needed to be

14   changed. *Id.* at 527. The Supreme Court observed that the disparate-impact doctrine has "always been

15   properly limited in key respects" to maintain its focus on "the 'removal of artificial, arbitrary, and

16   unnecessary barriers.'" *Id.* at 540 (quoting *Griggs*, 401 U.S. at 431). Those limitations include the

17   requirements that a plaintiff challenge a specific policy and show how it causes the alleged disparity,

18   and that the defendant be given the opportunity to articulate how the challenged policy serves a

19   legitimate interest. That is, the limitations it identified were ones that always had been present in

20   disparate-impact doctrine and were reflected in the 2013 Rule.

21        76.    Following *Inclusive Communities*, HUD took the position that the decision was

22   consistent with the 2013 Rule. When defending the 2013 Rule against a challenge by an insurance

23   trade group, HUD explained that the Supreme Court's decision is "fully consistent with the standard"

24   set forth in the 2013 Rule.[8] And in April 2017, HUD reiterated that the *Inclusive Communities* decision

25

26

---

27   [8] Defendants' Memorandum in Support of Their Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment at 33, ECF No. 65, *Am. Ins. Ass'n, et al. v. U.S. Dep't of Hous. & Urban Dev., et al.*, 74 F. Supp.

28   3d 30 (D.D.C. 2016) (No. 1:13-cv-00966-RJL).

1   "is entirely consistent" with the 2013 Rule, adding that "nothing in *Inclusive Communities* casts any

2   doubt on the validity of the Rule. To the contrary, the Court cited the Rule twice *in support* of its

3   analysis."[9]

4        77.     Several courts explicitly agreed. *See, e.g., MHANY Management, Inc. v. County of*

5   *Nassau*, 819 F.3d 581 (2d Cir. 2016); *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415

6   (4th Cir. 2018).

7        78.     Following *Inclusive Communities*, HUD continued to apply the longstanding disparate-

8   impact analysis to emerging issues, reflecting the key role that the Fair Housing Act was designed to

9   play in overcoming structural inequality caused by years of racism. For example, in 2016, HUD issued

10   guidance to housing providers concerning the use of criminal history information in denying rental

11   applications or making other housing decisions. HUD, Office of General Counsel Guidance on

12   Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing

13   and Real Estate-Related Transactions (Apr. 4, 2016), *available at*

14   https://www.hud.gov/sites/documents/HUD_OGCGUIDAPPFHASTANDCR.PDF.

15        79.     Consistent with the relaxed pleading standards that always have applied to HUD

16   administrative complaints, HUD stated that national statistics showing that racial minorities face

17   disproportionately high rates of arrest and incarceration—and thus are disproportionately excluded by

18   criminal-background rules—"provide grounds for HUD to investigate complaints challenging criminal

19   history policies." *Id.* at 3. It added that, during that HUD investigation, a housing provider must "be

20   able to prove through reliable evidence that its policy or practice of making housing decisions based on

21   criminal history actually assists in protecting resident safety and/or property." *Id.* at 5. Moreover, HUD

22   stated, policies that exclude based on criminal history "must be tailored to serve the housing provider's

23   substantial, legitimate, nondiscriminatory interest" rather than being unnecessarily exclusionary. *Id.* at

24   10. To be the least discriminatory alternative that serves legitimate interests, such a policy should "take

25   into consideration such factors as the type of the crime and the length of the time since conviction," *id.*

26   _____

27   [9] Defendants' Opposition to Plaintiff's Motion for Leave to Amend Complaint at 9, ECF. No. 122, *Prop. Casualty Insurers Ass'n of Am. v. Carson*, 2017 WL 2653069 (N.D. Ill. Apr. 21, 2017) (No. 1:13-cv-08564).

28

- 23 -

COMPLAINT
National Fair Housing Alliance, Fair Housing Advocates of Northern California, and BLDS, LTD d/b/a BLDS, LLC v. Ben Carson and U.S. Department
of Housing and Urban Development

1    and should provide the opportunity for a prospective tenant to present mitigating information and be

2    evaluated individually. *Id.* at 7.

3    **III.    The Final Rule Guts Long-Standing Disparate-Impact Doctrine**

4        80.    Now, however, HUD has abandoned the view that *Inclusive Communities* is fully

5    consistent with the 2013 Rule. Based on the pretext that *Inclusive Communities* requires it to do so,

6    HUD first proposed and has now finalized a rule that completely rewrites the 2013 Rule and upends

7    decades of law. The new Rule effectively guts disparate impact by excusing lenders, insurance

8    companies, housing providers, and others from the duty to adopt less discriminatory alternatives to

9    practices that have an unjustified disparate impact. This is a dismantling of the Fair Housing Act that

10   will prevent it from being used, as Congress intended, to address and diminish structural inequalities

11   and segregation in housing throughout the country.

12       81.    On August 19, 2019, HUD issued a notice of proposed rulemaking. It proposed to

13   radically alter and weaken the disparate-impact doctrine, adding requirements for pleading and proving

14   a case and defenses that HUD has never previously required and that have never existed in the case

15   law. *See* HUD's Implementation of the Fair Housing Act's Disparate Impact Standard, 84 Fed. Reg.

16   42,854 (proposed Aug. 19, 2019) ("Proposed Rule"). The agency justified these changes as

17   conforming its existing regulation with *Inclusive Communities*, although HUD had just three years

18   earlier taken the position that "nothing in *Inclusive Communities* casts any doubt on the validity" of the

19   existing rule.[10]

20       82.    HUD received 45,758 comments on its Proposed Rule, *see* HUD's Implementation of

21   the Fair Housing Act's Disparate Impact Standard, 85 Fed. Reg. 60288, 60289 (Sept. 24, 2020) ("Final

22   Rule"), the vast majority opposing it.

23       83.    Opposition to the Proposed Rule came not only from civil rights and fair housing

24   advocates, but also from businesses regulated by the Act. For example, in June 2020, Bank of America

25   and Quicken Loans executives sent a letter to HUD stating that the Proposed Rule was inappropriate in

26   ─────────────────────

27   [10] Defendants' Opposition to Plaintiff's Motion for Leave to Amend Complaint, ECF. No. 122, at 9, *PCIA v. Carson*, No.
     1:13-cv-08564 (N.D. Ill.)

28

COMPLAINT
National Fair Housing Alliance, Fair Housing Advocates of Northern California, and BLDS, LTD d/b/a BLDS, LLC v. Ben Carson and U.S. Department
of Housing and Urban Development

1    light of the national movement towards addressing the impact of discrimination, in particular structural

2    racism, on Black Americans.[11] Similarly, the National Association of Realtors urged HUD to abandon

3    the Proposed Rule, stating: "There is broad consensus across the country that now is not the time to

4    issue a regulation that could hinder further progress toward addressing ongoing systemic racism."[12]

5    These echoed concerns the realtors' group had expressed in comments, when it stated that HUD's

6    proposed changes "place too heavy a burden on the ability of parties to bring an initial disparate impact

7    claim."[13]

8         84.    Nonetheless, on September 24, 2020, HUD issued the Final Rule. Although HUD made

9    some slight adjustments, the effect of the Final Rule is the same: It makes it virtually impossible to

10   plead and prove a disparate-impact case under many circumstances. The Final Rule will prevent many

11   injured parties from ever filing important and meritorious suits, and it will cause the unwarranted

12   dismissal of many of those that do get filed. HUD promulgated this rule without providing any

13   reasoned explanation and without meaningfully acknowledging the overwhelming opposition,

14   including from the regulated industries. HUD also added a new defense that it did not even hint at in its

15   Proposed Rule, without providing notice nor the opportunity to comment.

16        85.    The Final Rule purports to radically change the substantive law governing the conduct

17   of lenders, insurance companies, housing providers, and others. Until now, disparate-impact doctrine

18   has required them to evaluate their policies for discriminatory effect and, where possible consistent

19   with business needs, adopt less discriminatory alternatives. Now HUD has effectively eliminated any

20

21

22   _____

23   [11] Andrew Ackerman, Lenders Oppose Federal Effort to Weaken Housing-Discrimination Rule, Wall Street Journal (July
     13, 2020), https://www.wsj.com/articles/lenders-oppose-federal-effort-to-weaken-housing-discrimination-rule-
     11594667932. Wells Fargo, Citibank, and J.P. Morgan Chase likewise urged HUD not to destroy the effectiveness of
24   disparate impact and instead to acknowledge the growing understanding that, as Wells Fargo put it, "centuries of
     discrimination, segregation and economic disenfranchisement have lasting impacts today." Emily Flitter, Big Banks'
25   "Revolutionary" Request: Please Don't Weaken This Rule, N.Y. Times (July 16, 2020),
     https://www.nytimes.com/2020/07/16/business/banks-housing-racial-discrimination.html.

26   [12] Id.

27   [13] National Association of Realtors, Comment Letter on HUD's Implementation of the Fair Housing Act's Disparate
     Impact Standard (Oct. 18, 2019), https://narfocus.com/billdatabase/clientfiles/172/3/3449.pdf.

28

- 25 -

COMPLAINT
National Fair Housing Alliance, Fair Housing Advocates of Northern California, and BLDS, LTD d/b/a BLDS, LLC v. Ben Carson and U.S. Department
of Housing and Urban Development

1   mechanism for accountability, allowing them to continue existing practices with unnecessary

2   discriminatory effect or implement new ones.

3       86.     Illustrating how the Final Rule unsettles the law, HUD explicitly stated that it will

4   reconsider its guidance for housing providers regarding proper consideration of criminal records—as

5   well as all other guidance to regulated entities based on traditional disparate-impact principles—"for

6   consistency with the Final Rule." Final Rule, 85 Fed. Reg. at 60330.

7       87.     HUD has made these dramatic changes without providing reasoned explanation. It

8   contends it is simply following *Inclusive Communities*, but that decision *reaffirmed* the validity of

9   longstanding disparate-impact doctrine, as well as the importance of the practical availability of

10  disparate-impact claims to the achievement of the Fair Housing Act's purposes. It cannot justify

11  making such claims largely unavailable. And because the Supreme Court specifically declined to

12  review the details of how disparate-impact claims are adjudicated in *Inclusive Communities*, that case

13  cannot justify HUD's wholesale rewriting of the law.

14      88.     Based on the false premise that *Inclusive Communities* fundamentally upended

15  disparate-impact doctrine, the Final Rule rewrites the 2013 Rule and explicitly declines to follow

16  decades of precedent, imposing novel and onerous requirements on plaintiffs and inventing new

17  defenses that courts have never applied. It decisively changes the rules at every stage of a disparate

18  impact case, with the cumulative effect being to insulate potential defendants from having to consider

19  and adopt less discriminatory alternatives. The bottom line is that the Final Rule destroys the disparate-

20  impact doctrine's effectiveness at "eradicat[ing] discriminatory practices within a sector of our

21  Nation's economy." *Inclusive Communities*, 576 U.S. at 539.

22      **A.    The Final Rule Imposes Onerous New Pleading Requirements, Making It Virtually
             Impossible to Plead a Disparate-Impact Case**

23

24      89.     The Final Rule begins by purporting to impose new pleading requirements that will

25  prevent most disparate-impact cases from even getting started. It requires a plaintiff in federal court or

26  a charging party before HUD to *plead* facts that have never been required to *prove* a claim, and that

27  amount to allegations that a defendant is acting so arbitrarily as to raise an inference of intentional

28

COMPLAINT
National Fair Housing Alliance, Fair Housing Advocates of Northern California, and BLDS, LTD d/b/a BLDS, LLC v. Ben Carson and U.S. Department
of Housing and Urban Development

1  discrimination. All this must be done before a defendant is even required to articulate a justification for

2  its policy or practice.

3              ***i.     Arbitrary, Artificial and Unnecessary***

4      90.     The Final Rule purports to add entirely new substantive elements to a disparate-impact

5  claim. It requires the plaintiff to plead facts showing:

6              That the challenged policy or practice is *arbitrary, artificial, and unnecessary* to

7              achieve a valid interest or legitimate objective such as a practical business, profit, policy

8              consideration, or requirement of law[.]

9  85 Fed. Reg. at 60332 (codified at New 24 C.F.R. § 100.500(b)(1)) (emphasis added).

10     91.     Plaintiffs have always had to plead that a policy has a disparate impact based on race or

11 another protected class. Now HUD purports to require also the pleading of facts that anticipate and

12 rebut the defendant's justification for the policy, that is, facts showing that the policy is entirely

13 "arbitrary," *and* "artificial," *and* "unnecessary." A policy is "arbitrary, artificial, and unnecessary," the

14 Final Rule says, only if it does not serve any "valid interest" at all. *Id*. HUD confirms in the Final

15 Rule's preamble that a plaintiff must plead facts to support each new adjective—artificial, arbitrary,

16 *and* unnecessary—separately, such that HUD effectively is imposing *three* new requirements at once.

17 Final Rule, 85 Fed. Reg. at 60312 & n. 105.

18     92.     None of this has ever been required to *prove* a disparate impact case, much less *plead*

19 one, and for good reason: these requirements are incompatible with the very premises of the disparate-

20 impact doctrine. Many policies with a disparate impact have at least *some* facially legitimate

21 justification, and so they are not entirely "arbitrary," and "artificial," and "unnecessary." Yet it has

22 always been unlawful for a defendant to maintain them if the defendant could accomplish its legitimate

23 purpose with a less discriminatory alternative. Through the artifice of a new pleading requirement, the

24 Final Rule makes it irrelevant whether a less discriminatory alternative could accomplish the

25 defendant's legitimate purposes.

26     93.     And even where the defendant's practices *are* entirely "arbitrary, artificial, and

27 unnecessary," the Final Rule *still* immunizes them from effective scrutiny. It does so by requiring a

28

COMPLAINT
National Fair Housing Alliance, Fair Housing Advocates of Northern California, and BLDS, LTD d/b/a BLDS, LLC v. Ben Carson and U.S. Department
of Housing and Urban Development

1  plaintiff or charging party to *plead* specific facts demonstrating as much just to start a case. That is, it

2  requires pre-discovery pleading of facts that only the defendant knows regarding the lack of

3  justification for the challenged practices. The Final Rule thus reverses the longstanding sequence

4  whereby a defendant proffers a legitimate justification and then the validity of that justification is the

5  subject of discovery. Cases such as *Black Jack* and *St. Bernard Parish*—in which the flimsiness of the

6  defendant's purported justifications was revealed in discovery—could not have gotten started under

7  this rule.

8     94.    Commenters explained to HUD that requiring plaintiffs to meet this new pleading

9  requirement would greatly curtail or eliminate the disparate-impact doctrine. As the National

10  Association of Realtors put it: "It is unreasonable to expect a claimant, especially a vulnerable, injured

11  party, to know the specifics of a defendant's business so as to be able to make this assertion of

12  'arbitrary, artificial, or unnecessary.'"[14]

13     95.    HUD did not meaningfully respond to those comments, and it did not explain how a

14  plaintiff would plead that a claim is "artificial," and "arbitrary," and "unnecessary" without pleading a

15  claim of intentional discrimination. Tellingly, HUD provides no example—real or even hypothetical—

16  of a plaintiff in a disparate-impact suit successfully pleading facts showing that a policy is "arbitrary"

17  and "artificial," and "unnecessary."

18        ii.    ***Significant Disparity*, *Robust Causal Link*, *Direct Cause*, and *Direct***
19           ***Relation***

20     96.    The Final Rule purports to impose a host of other new pleading requirements that make

21  it even *more* difficult for a victim of discrimination to allege a disparate-impact claim such that their

22  claim can be investigated by HUD or proceed to discovery in federal court.

23     97.    The Final Rule carries forward the requirement of the 2013 Rule and decades of case

24  law that a plaintiff must identify a policy or practice that is responsible for causing the disparate impact

25  alleged. 85 Fed. Reg. 60332 (24 C.F.R. § 100.500(a)). Then it goes much further. It requires the

26  _____

27  [14] National Association of Realtors, Comment Letter on HUD's Implementation of the Fair Housing Act's Disparate
Impact Standard 2.

28

COMPLAINT
National Fair Housing Alliance, Fair Housing Advocates of Northern California, and BLDS, LTD d/b/a BLDS, LLC v. Ben Carson and U.S. Department
of Housing and Urban Development

1  plaintiff to allege that the disparity is "significant," *id.* § 100.500(b)(4); that there is a "robust causal

2  link" between the challenged policy or practice and the adverse effect on members of a protected class,

3  which the Final Rule states means that the specific policy or practice is the "direct cause" of the

4  discriminatory effect, *id.* § 100.500(b)(3); and that there is a "direct relation" between the alleged

5  injury and conduct, *id.* § 100.500(b)(5). These overlapping requirements—none of which HUD

6  meaningfully defines—create ill-defined hurdles that will be insurmountable for many victims of

7  discrimination. Despite requests from commentators that HUD provide a modicum of clarity by

8  defining its new terms, HUD explicitly refuses to do so.

9     98.     Each of these pleading requirements is problematic individually. Cumulatively, they

10  make it unreasonably and improperly difficult to plead a disparate-impact claim.

11     99.     The requirement to plead a "<u>significant</u>" disparity raises the bar to plead a case, while

12  leaving litigants and courts uncertain as to how much, because HUD refused to define the term. Final

13  Rule, 85 Fed. Reg. at 60314. It also constitutes an unjustified and unexplained about-face, because

14  HUD expressly considered and rejected a significance requirement when promulgating the 2013 Rule.

15  78 Fed. Reg. at 11468-69. In the Final Rule, HUD fails to acknowledge this reversal, let alone explain

16  why the reasons for rejecting this requirement in 2013 are no longer valid.

17     100.     With respect to causation, the 2013 Rule already required the plaintiff to plead that the

18  challenged policy *caused* the discriminatory effect. Under the Final Rule, victims of discrimination

19  must plead a "<u>robust causal link</u>" between the challenged policy or practice and the discriminatory

20  effect, which HUD defines to mean "that the specific policy or practice is the <u>direct cause</u> of the

21  discriminatory effect." 85 Fed. Reg. at 60332. The requirement that a plaintiff plead that the

22  challenged policy or practice is the "direct cause" of the alleged discriminatory effect has no basis in

23  either the agency's past work or in case law, and HUD makes no effort to justify it in policy terms.

24  HUD simply claims this new element is required by *Inclusive Communities*, although that decision

25  does not use the phrase "robust causal link," nor does it suggest a "direct cause" requirement. *Id.*

26     101.     NFHA and other commenters identified these problems in response to the Proposed

27  Rule. HUD's only reply was to point to language in *Inclusive Communities* discussing the importance

28

COMPLAINT
National Fair Housing Alliance, Fair Housing Advocates of Northern California, and BLDS, LTD d/b/a BLDS, LLC v. Ben Carson and U.S. Department
of Housing and Urban Development

1    of enforcing a "robust causality requirement" (which, in context, clearly referred to the long-standing

2    requirement, reflected in the 2013 Rule but not followed by the district court in that case, that a

3    plaintiff must allege that a specific practice causes the alleged disparate impact; it did not suggest any

4    heightened causation standard). *Id*. at 60313. Simply referring in a conclusory manner to language in

5    *Inclusive Communities* is not a reasoned response to comments stating that HUD is misconstruing that

6    language.

7         102.    Furthermore, the phrase "robust causal link" does not have any pre-existing meaning,

8    either in case law or in plain English. HUD stated, without explanation, that it intends the phrase to

9    mean "that the policy or practice is the direct cause of the discriminatory effect," *id*. at 60312. That is,

10   HUD not only has invented a "robust causal link" pleading requirement through a misquoting of

11   *Inclusive Communities*, it has assigned a "direct cause" meaning to that term that it does not even try to

12   tether to that decision.

13        103.    HUD separately requires plaintiffs to plead that "there is a <u>direct relation</u> between the

14   injury asserted and the injurious conduct alleged." *Id*. at 60315. The Final Rule does not explain how

15   this requirement differs from or interacts with the "direct cause" requirement. HUD derives this "direct

16   relation" language not from *Inclusive Communities*, but from *Bank of America Corp. v. City of Miami*,

17   137 S. Ct. 1296 (2017). That case stated that, like most torts, a Fair Housing Act claim requires

18   proximate cause, *i.e.*, a showing of "some direct relation between the injury asserted and the injurious

19   conduct alleged." *Id.* at 1306 (quotations and citation omitted). Observing that such a showing varies

20   by statute, the Court declined to determine how direct a relationship is required under the Fair Housing

21   Act, instead remanding for lower courts to do so.

22        104.    On remand in *Bank of America* itself, the Eleventh Circuit found that proximate cause

23   for claims brought under the Act, which "has a broad remedial purpose" and "is written in decidedly

24   far-reaching terms," must extend "far beyond the single most immediate consequence of a violation."

25   *City of Miami v. Wells Fargo & Co.*, 923 F.3d 1260, 1278-80 (11th Cir. 2019). Accordingly, the

26   Eleventh Circuit explicitly rejected the argument that the defendant's actions must "direct[ly] cause" a

27   plaintiff's injury, observing that the Supreme Court instead has required only "some direct relation"—

28

- 30 -

1   which it characterized as "a meaningful and logical continuity"—between the challenged practice and

2   the alleged harm. *Id.* at 1272.

3       105.    Similarly, the Ninth Circuit, construing the Fair Housing Act proximate cause

4   requirement established by *Bank of America*, rejected the notion that a defendant's challenged policy

5   must be the "direct cause" of the alleged harm. It found that "Congress intended the scope of the

6   statute's proximate-cause requirement to be far-reaching, and to include aggregate, city-wide injuries,"

7   not just injuries inflicted directly on an individual plaintiff. *City of Oakland v. Wells Fargo & Co.*, 972

8   F.3d 1112, 1124 (9th Cir. 2020).

9       106.    Thus, the "direct cause" requirement appears nowhere in *Inclusive Communities* or

10   *Bank of America*, and it is directly contradicted by the two federal appellate courts that have

11   considered whether such a requirement exists.

12              *iii.*    ***Forcing HUD Complaints to Meet the Pleading Standards of Federal***
              ***Court Complaints***

13

14       107.    In addition to purporting to impose pleading standards that will often be impossible to

15   meet for disparate-impact claims filed in federal court, HUD also imposed these newly heightened

16   requirements on administrative complaints alleging disparate impact. In so doing, HUD made its own

17   administrative process—which is meant to be a much less formal, less burdensome alternative to filing

18   in court—virtually unavailable to people harmed by policies with an unjustified disparate impact.

19       108.    HUD has long maintained its complaint process as one that can be navigated even by a

20   non-lawyer. Its regulations regarding what information a complainant must provide are written plainly,

21   and require the most basic information: (1) Name, address, and phone number of complainant; (2) The

22   same for the defendant; (3) If a specific property is involved, its address and description; and (4) "A

23   brief description of how you were discriminated against in an activity related to housing[,]" including

24   "the date when the discrimination happened and why you believe the discrimination occurred because

25   of race" or other protected classes. 24 C.F.R. § 103.25.

26       109.    Once that simple complaint is filed, HUD takes on the responsibility to investigate.

27   HUD has the responsibility to "obtain information concerning the events or transactions that relate to

28

COMPLAINT
National Fair Housing Alliance, Fair Housing Advocates of Northern California, and BLDS, LTD d/b/a BLDS, LLC v. Ben Carson and U.S. Department
of Housing and Urban Development

1   the alleged discriminatory housing practice," to "document policies or practices of the respondent

2   involved," and to "develop factual data necessary . . . to make a determination . . . whether reasonable

3   cause exists to believe that a discriminatory housing practice has occurred or is about to occur[.]" 24

4   C.F.R. § 103.200.

5       110.   The Final Rule upends this process, requiring a complaint filed with HUD alleging

6   unlawful discriminatory impact to meet the pleading standards of a federal court complaint in order to

7   trigger HUD's duty to investigate and adjudicate the complaint.

8       111.   Commenters explained to HUD that this change would be inconsistent with HUD's own

9   regulations and long-standing practices, and that it would destroy the efficacy of the complaint process

10   for resolving disputes without the formality and expense of federal court. In response, HUD stated only

11   that doing this is "within HUD's expertise given its role in implementing the Fair Housing Act" and

12   that its rule "is consistent with the FRCP [Federal Rules of Civil Procedure]." Final Rule, 85 Fed. Reg.

13   at 60307. HUD neither offered a reasoned explanation for requiring agency complaints to meet that

14   standard, nor denied that the HUD process will no longer be as effective a forum for disparate-impact

15   claims.

16   **B.**    **The Final Rule Dramatically Changes Both Parties' Burdens At The Proof Stage,**
17           **Making It Virtually Impossible To Prove A Disparate-Impact Case**

18       112.   The Final Rule also radically alters the burden-shifting framework of the 2013 Rule for

19   the proof stage. In doing so, it purports to eliminate substantive obligations that disparate-impact law

20   has always imposed on lenders, insurance companies, housing providers, and others. Even after a

21   plaintiff has *proven* that a policy causes discriminatory effects, the Final Rule permits a defendant to

22   maintain the policy so long as that policy serves *some* legitimate purpose, even an insubstantial one.

23   Disparate impact's traditional and core requirement that a defendant search for, and where available,

24   adopt a less discriminatory alternative is cast aside.

25       113.   Consistent with decades of case law, the 2013 Rule provided that, once a plaintiff

26   established a policy's discriminatory effect, the burden shifted to the defendant to establish that the

27   policy was "necessary to achieve one or more substantial, legitimate, nondiscriminatory interests." 78

28

COMPLAINT
National Fair Housing Alliance, Fair Housing Advocates of Northern California, and BLDS, LTD d/b/a BLDS, LLC v. Ben Carson and U.S. Department
of Housing and Urban Development

1  Fed. Reg. at 11463. The 2013 Rule required the defendant to do so with "evidence"; its justification

2  "may not be hypothetical or speculative." *Id.* For a defendant's interest to be "substantial," it had to be

3  "a core interest of the organization that has a direct relationship to the function of that organization."

4  *Id*. at 11470. Finally, if the defendant met that burden, the burden shifted back to the plaintiff to show

5  that those interests "could be served by another practice that has a less discriminatory effect." *Id*. at

6  11480. If the plaintiff met that burden, the practice was unlawful.

7       114.    As HUD explained in the 2013 Rule, those burdens were consistent with well-

8  established FHA case law. Moreover, they were largely synonymous with the "business necessity"

9  standard that applies to employment discrimination claims under Title VII and that both HUD and

10  financial regulators had applied for many years with respect to the FHA and other laws such as ECOA.

11  *Id*. at 11471.

12       115.    The Final Rule changes this framework in several ways. These changes allow a

13  defendant to maintain a policy with proven discriminatory effects *without* establishing that the policy is

14  necessary to meet legitimate interests.

15       116.    First, even after a plaintiff has successfully met the high bar of pleading that a policy is

16  "arbitrary, artificial, and unnecessary to achieve a valid interest," the Final Rule does not require a

17  defendant to prove otherwise; it only requires the defendant to produce some unspecified quantum of

18  evidence to the contrary. New 24 C.F.R. § 100.500(c)(2). Second, the defendant need only produce

19  evidence suggesting that the challenged policy or practice "advances a valid interest," not that it is

20  *necessary* to accomplish that interest. *Id*. § 100.500(c)(2). Third, the Final Rule defines a "valid

21  interest" expansively to include any "practical business, profit, policy consideration, or requirement of

22  law." *Id*. § 100.500(b)(1).

23       117.    Thus, in response to allegations demonstrating that its policy is "arbitrary, artificial, and

24  unnecessary," under the Final Rule, 85 Fed. Reg. at 60311, a defendant need only produce evidence

25  suggesting that the challenged policy is not wholly irrational for a profit-seeking enterprise. This

26  burden can be met readily in virtually any case challenging, for example, a requirement to secure a

27

28

1    home loan. A lender can almost always produce evidence suggesting that the requirement helps it

2    make a profit.

3        118.    If the defendant meets that low burden of "rebut[ting]" an allegation that its policy is

4    "arbitrary, artificial, and unnecessary," that ends the case. *See* New 24 C.F.R. § 100.500(c)(3). The

5    Final Rule only shifts the burden back to the plaintiff if the defendant rebuts *other* allegations, but not

6    if the defendant rebuts the allegation that its policy is "arbitrary, artificial, and unnecessary." *See id.*

7    Under the Final Rule, it does not matter that the policy excludes people in discriminatory ways and that

8    a less discriminatory alternative could serve the defendant's legitimate interests.

9        119.    This change eviscerates longstanding substantive requirements for lenders, insurance

10   companies, and housing providers to comply with the Fair Housing Act. So long as they maintain some

11   evidence supporting the argument that their policies are meant to further a profit motive or other

12   standard business rationale, they will not face disparate-impact liability and so can maintain

13   discriminatory practices with impunity.

14       120.    Relieving potential defendants of the requirement to adopt less discriminatory

15   alternatives is contrary to decades of precedent, including *Inclusive Communities*, and HUD has no

16   authority to change this law. HUD offers no explanation for doing so. And HUD violated notice-and-

17   comment requirements by omitting this change from the Proposed Rule but including it in the Final

18   Rule.

19       121.    The Final Rule changes the proof standards in other ways as well, all of which make it

20   substantially more difficult for the victim of a discriminatory practice to prove their case and thereby

21   immunize regulated entities from any real risk of disparate-impact liability. *See, e.g.*, New 24 C.F.R.

22   §§ 100.500(b)(1), (c)(3).

23       122.    HUD offers no reasoned explanation for these changes—many of which contradict

24   substantiated findings in the 2013 Rule as to not only the Fair Housing Act's best interpretation, but

25   also the best policy choices for implementing it. In 2013, HUD explained that the burden-shifting test

26   it then codified would create real-world incentives, consistent with the FHA's broad purposes, for

27   covered entities to "conduct consistent self-testing and compliance reviews, document their substantial,

28

- 34 -

COMPLAINT
National Fair Housing Alliance, Fair Housing Advocates of Northern California, and BLDS, LTD d/b/a BLDS, LLC v. Ben Carson and U.S. Department
of Housing and Urban Development

1   legitimate nondiscriminatory interests, and resolve potential issues so as to prevent future litigation."

2   2013 Rule, 78 Fed. Reg. at 11472. In the Final Rule, by contrast, HUD does not acknowledge, let alone

3   justify, that it is eliminating any such incentive.

4        123.   The only justifications HUD musters for drastically changing the parties' respective

5   burdens are woefully lacking. HUD asserts that *Inclusive Communities* stated "that the Fair Housing

6   Act is not an instrument to force housing authorities to reorder their priorities, but rather to ensure that

7   those priorities can be achieved without arbitrarily creating discriminatory effects." 85 Fed. Reg. at

8   60320. But HUD makes no attempt to connect this language—which has no obvious relevance—to its

9   actions. Nor does anything else in *Inclusive Communities* support HUD's action. To the contrary,

10   *Inclusive Communities* characterizes the defendant's proper burden several times in ways that are

11   consistent with the 2013 Rule, and inconsistent with the 2020 Rule. *See, e.g.*, *Inclusive Communities*,

12   576 U.S. at 541 (characterizing defendant's burden as "analogous to the business necessity standard

13   under Title VII"); *id.* (housing authorities and private developers must "be allowed to maintain a policy

14   if they *can prove it is necessary* to achieve a valid interest") (emphasis added). That is to be expected,

15   since the Supreme Court explicitly declined to review anything other than whether disparate-impact

16   claims are cognizable under the Fair Housing Act.

17        124.   HUD predominantly relies instead on *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642

18   (1989), to justify its drastic changes to the burden-shifting framework. But *Wards Cove*, a decision

19   construing Title VII of the Civil Rights Act that Congress immediately overruled with respect to that

20   statute, cannot justify a change decades later to the long-standing rules governing Fair Housing Act

21   claims.

22        125.   The bottom line is that the Final Rule fundamentally changes the law of disparate

23   impact by increasing the evidentiary burden on plaintiffs and lowering the evidentiary burden on

24   defendants, making claims nearly impossible to prove. HUD thus fundamentally and without

25   justification alters the incentive structure for regulated entities that HUD itself recognized in 2013 but

26   no longer acknowledges.

27

28

**C.      The Final Rule Adds New and Unfounded Affirmative Defenses that Exempt Whole Industries from Effective Disparate-Impact Scrutiny**

126.     The Final Rule also adds two new affirmative defenses to a Fair Housing Act disparate-impact claim. Neither has any foundation in the law.

### i.      Predictive Policy Defense

127.     Without having first proposed it for comment, HUD in the Final Rule instituted a special defense for defendants who employ a "policy or practice" that is "intended to predict an occurrence of an outcome."  New 24 C.F.R. § 100.500(d)(2)(i)). This "predictive policy" defense has no basis in any Fair Housing Act jurisprudence or any current industry compliance practices, and HUD does not contend otherwise. *See* 85 Fed. Reg. at 60290. The provision is drafted in an exceptionally confusing manner, and HUD offers little explanation for how it works. Based on what little explanation HUD does provide, it appears to create an enormous loophole that further immunizes from disparate-impact scrutiny many of the policies that have the greatest potential for discriminatory effects on the housing market.

128.     This defense did not appear in the Proposed Rule, which instead included several defenses against challenges to policies based on algorithmic models. Many comments explained how these defenses did not conform to law and would have exempted entirely from disparate-impact scrutiny a wide swath of discriminatory models. HUD deleted the algorithmic model defenses, which it acknowledged "would likely have been unnecessarily broad in their effect," *id.*, and replaced them with the novel "predictive policy" defense, which it characterizes as "an alternative for the algorithm defenses." *Id.*

129.     This "alternative" was not included or mentioned in the Proposed Rule such that the public had a chance to comment on it. It functions entirely differently from the earlier algorithm defense. HUD does not justify it by reference to any existing case law or compliance practice, and it does not explain what gives it the authority to create an entirely new defense.

130.     Because HUD fashioned a new defense without the benefit of public comment or grounding in case law or existing compliance practice, it is unsurprising that what it produced is

1   virtually unintelligible. But to the extent that the defense's meaning can be parsed, it functions as an

2   exemption from traditional disparate-impact scrutiny.

3       131.    HUD incorrectly suggests that the "predictive policy" defense cures the problems of the

4   jettisoned algorithmic model defense because it is narrower. By its plain terms, this defense extends

5   even more broadly, to not only the growing number of models that automate decision making, but also

6   the crudest discretionary and judgmental prediction policies. For example, a policy directing loan

7   officers to deny credit to anyone they deem too "suspicious" to be creditworthy is, on its face, a policy

8   "intended to predict an occurrence of an outcome." *Id.* at 60333.

9       132.    For the vast number of policies that qualify for this defense, the defense represents a

10  virtual get-out-of-jail-free card against a disparate-impact challenge. A policy is largely immune from

11  challenge if "the prediction represents a valid interest, and the outcome predicted by the policy or

12  practice does not or would not have a disparate impact on protected classes compared to similarly

13  situated individuals not part of the protected class." New 24 C.F.R. § 100.500(d)(2)(i).

14      133.    This language is confusingly drafted, and HUD does not explain what it means for an

15  "outcome predicted" to have a "disparate impact," or for classes to be "similarly situated" for these

16  purposes. But HUD appears to construe this defense to permit entities to escape disparate-impact

17  liability even if their policies unnecessarily exclude Black people (or other protected classes) in a

18  discriminatory fashion. A defendant need only proffer an analysis of what happens to those to whom

19  the defendant *did* offer service. If that set of individuals have similar "outcomes" (*e.g.*, likelihood of

20  defaulting on a home loan) regardless of protected class status, then the defendant is exempt from

21  liability notwithstanding the discriminatory impact of its policy on people that were *denied* service.

22      134.    HUD explains that, in its view, if a lender disproportionately excludes people in a

23  protected class improperly, those applicants from the protected class who *do* receive loans necessarily

24  must be overqualified, and so should be expected to default less frequently. Final Rule, 85 Fed. Reg. at

25  60290. If, instead, they default at the same rate as non-members once they do get loans, the defendant

26  was *right* to exclude protected class members at a higher rate, and so there *cannot* have been

27  discrimination in the application process. *Id.*

28

COMPLAINT
National Fair Housing Alliance, Fair Housing Advocates of Northern California, and BLDS, LTD d/b/a BLDS, LLC v. Ben Carson and U.S. Department
of Housing and Urban Development

135.     This new defense is inconsistent with established disparate-impact principles—HUD does not even attempt to root it in established jurisprudence—and the premise is severely flawed. There is little relationship between whether a policy fails traditional disparate-impact analysis (*i.e.*, whether it is unnecessarily exclusionary in a discriminatory way, and could be made more inclusionary consistent with legitimate interests) and whether it fails HUD's novel substitute test, which focuses only on people that were approved by a challenged policy. The latter has little bearing on the former. Without considering the characteristics of *all* applicants, including those who were rejected, it is not possible to determine that the selection process was more lenient or "overly restrictive" for a protected class.

136.     As a statistical matter, it is wrong that equal default rates among protected class members who *do* meet credit-worthiness requirements indicate whether a model was "overly restrictive" or discriminatory in excluding others that do *not* meet those requirements. *Id.* Accordingly, the "predictive policy" defense necessarily allows many of those employing predictive policies to be excused from compliance with the Fair Housing Act.

137.     At least one court in an employment discrimination suit has rejected arguments akin to the HUD defense. *See Com. of Pa. v. O'Neill*, 348 F. Supp. 1084, 1095-96 (E.D. Pa. 1972), *order vacated in part*, No. 72-1614, 1972 WL 2595 (3d Cir. Sept. 14, 1972), *on reh'g*, 473 F.2d 1029 (3d Cir. 1973), *and aff'd in part, vacated in part*, 473 F.2d 1029 (3d Cir. 1973). The defendant in that suit attempted to defend against disparate-impact claims by focusing only on characteristics of employees that benefitted from a policy or practice (*i.e.*, "accepted" employees), and argued that characteristics of employees within that "accepted" population indicated the defendant must have been more lenient in accepting minority applicants. The court rejected that defense. *Id*. at 1096 (rejecting as unsound argument that "because accepted blacks in all three years covered by the study had a higher number of negative factors than accepted whites" the defendant "must be more lenient in accepting blacks than whites").

138.     To illustrate the illogic of this defense—and how it eviscerates traditional disparate-impact doctrine—imagine a policy that denies home loans to all applicants with any arrest history, on

1   the dubious premise that such history predicts likelihood of default. The policy will almost certainly

2   have a disproportionately adverse effect on minority applicants, who are more likely to have been

3   arrested due to discriminatory laws and law enforcement practices.

4       139.    Under HUD's new defense, however, this policy would be immune from challenge if

5   those minority borrowers who *received* credit (who, by definition, have no arrest history) default as

6   frequently as non-minority borrowers (who also, by definition, have no arrest history). That condition

7   will frequently be met, because so many *other* variables unrelated to the challenged policy influence

8   default rates (including *other* discrimination), yet it has nothing to do with whether the arrest record

9   ban can be justified.

10      140.    This defense thus allows defendants to maintain policies that have unnecessary

11  disparate impact based on facts that should be irrelevant to the analysis. Moreover, a person who is

12  *denied* service will not know in advance whether this defense applies, further discouraging disparate-

13  impact challenges.

14      141.    In many cases, public data is available to support claims that policies and practices have

15  disproportionate adverse effects on protected classes, *i.e.*, to state a claim under current disparate-

16  impact jurisprudence. For example, under the Home Mortgage Disclosure Act, loan-level data about

17  mortgage *applications* and *originations* is publicly available for large-volume lenders. See 12 U.S.C.

18  § 2801 *et seq.*; 12 C.F.R pt. 1003. It thus is possible to see whether some lenders deny mortgage loans

19  to people in protected classes at disproportionate rates.

20      142.    In contrast, comparable information about how often people *default* on their loans is *not*

21  publicly available.

22      143.    The Final Rule purports to allow proof of the existence of a less discriminatory

23  alternative in response to a defendant interposing this new "predictive policy" defense, but it does so in

24  a way that makes that right illusory. The Final Rule provides that the defense does not apply "if the

25  plaintiff demonstrates that an alternative, less discriminatory policy or practice would result in the

26  *same outcome* of the policy or practice, without imposing materially greater costs on, or creating other

27  material burdens for the defendant." New 24 C.F.R. § 100.500(d)(2)(i)) (emphasis added). That is,

28

COMPLAINT
National Fair Housing Alliance, Fair Housing Advocates of Northern California, and BLDS, LTD d/b/a BLDS, LLC v. Ben Carson and U.S. Department
of Housing and Urban Development

1   rather than being required to show that a less discriminatory alternative would satisfy a defendant's

2   legitimate interests (the traditional disparate-impact test), a plaintiff now must show that the less

3   discriminatory alternative would "result in the same outcome." *Id.*

4        144.   HUD does not explain what the rule means by "same outcome." But this language

5   appears to require a plaintiff to prove counterfactuals that will generally be unknowable. HUD does not

6   explain how any plaintiff could ever avail itself of this supposed opportunity to overcome the

7   "predictive policy" defense.

8        145.   The predictive policy defense is especially problematic as lenders and others move to

9   reliance on machine learning models that "learn" what makes people better or worse credit candidates

10  based on a host of variables that do not appear on a conventional application or in traditional credit

11  files. Left to their own devices, machine learning models will find ways to proxy race as a factor

12  through combining other factors—effectively instituting intentional race discrimination—and the Final

13  Rule would often permit them to do so. A model that rejects Black applicants based on factors closely

14  correlated to race will pass scrutiny so long as those Black consumers approved by the model perform

15  the same as white consumers, regardless of how many Black applicants are unnecessarily excluded.

16       146.   These defects would have been explained to HUD had the agency included its new

17  predictive policy defense in the proposed rule. HUD did not do so, precluding any opportunity to

18  comment on this novel defense that will effectively excuse any number of discriminatory policies that

19  can be characterized as making a prediction.

20           *ii.*   ***Third-Party Requirements Defense***

21       147.   The Final Rule also allows a defendant to escape disparate-impact liability by

22  establishing that challenged policy or practice was "reasonably necessary to comply with a third-party

23  requirement," including a federal or state law, or a judicial decision. New 24 C.F.R.

24  § 100.500(d)(2)(iii). This affirmative defense is entirely new.

25       148.   As HUD makes clear in the Final Rule's Preamble, "reasonably necessary" does not

26  mean "actually necessary." Under the Final Rule, a defendant need not show that it was *required* by a

27  third party to take the challenged action, that the third party prevents it from adopting a less

28

COMPLAINT
National Fair Housing Alliance, Fair Housing Advocates of Northern California, and BLDS, LTD d/b/a BLDS, LLC v. Ben Carson and U.S. Department
of Housing and Urban Development

1   discriminatory alternative, or even that the supposedly restricting third-party requirement was the

2   primary reason it adopted the policy. 85 Fed. Reg. at 60290.

3        149.    This defense is another large loophole for heavily regulated industries such as banks

4   and insurance companies. Virtually any policy that such companies adopt amounts to some form of

5   compliance with a legal or regulatory requirement. Moreover, the Final Rule would allow defendants

6   to proffer this defense at the *pleading* stage, making the facts irrelevant. All a defendant need show is

7   that it operates in a heavily regulated space, and it is exempted from disparate-impact liability.

8        150.    The third-party requirement defense amounts to a retreat by HUD from a proposed

9   change it could not defend to a substitute that is no better. HUD originally proposed an exemption that

10  applies whenever an entity's "discretion" is "materially limited" by law or other third parties. Proposed

11  Rule, 84 Fed. Reg. at 42859. Many commenters explained that this proposal would effectively

12  immunize heavily regulated industries from any requirement to exercise their discretion in the least

13  discriminatory fashion feasible. Final Rule, 85 Fed. Reg. at 60316. HUD substituted the "reasonably

14  necessary" language in response, but then made clear in that the new language amounts to the same

15  thing. *Id*. at 60290.

16       151.    HUD has no statutory authority to provide such categorical immunity to regulated

17  industries. And HUD's decision to do so is arbitrary and capricious, because (among other things)

18  HUD has not explained why such immunity *should* be given. Indeed, HUD responded to criticisms of

19  the "materially limited" proposed defense by acknowledging that they were correct, but then imposed a

20  defense that functions in the same fashion anyway.

21       **D.    The Final Rule Eliminates Perpetuation of Segregation as a Cognizable Harm and
             Eliminates Claims Based on Predictable Disparate Impact**

22

23       152.    Finally, the Final Rule removes "perpetuation of segregation" as a recognized

24  discriminatory effect under the FHA. 85 Fed. Reg. at 60306. That is, under the Final Rule, a policy that

25  perpetuates racial segregation without justification is not unlawful for that reason; it must *also* have

26  some *other* form of discriminatory effect. The Final Rule also eliminates the opportunity for a plaintiff

27  to show that a policy causes "or predictably causes" a discriminatory effect. *Id*.

28

COMPLAINT
National Fair Housing Alliance, Fair Housing Advocates of Northern California, and BLDS, LTD d/b/a BLDS, LLC v. Ben Carson and U.S. Department
of Housing and Urban Development

1    153.    Under the 2013 Rule—and consistent with decades of FHA jurisprudence—a practice

2    produces a discriminatory effect where it "*actually or predictably* results in a disparate impact on a

3    group of persons or creates, increases, reinforces, *or perpetuates segregated housing patterns* because

4    of race, color, religion, sex, handicap, familial status, or national origin." Former 24 C.F.R. §

5    100.500(a) (emphasis added). The Final Rule eliminates this definition, thus simultaneously changing

6    the law in two different ways. First, the perpetuation of segregation is no longer a cognizable harm that

7    can be challenged under the Fair Housing Act in its own right. Second, the Final Rule no longer

8    reflects established Supreme Court law recognizing that a challenge can be brought to a policy with a

9    "predictable" disparate impact that has not yet manifested. *Inclusive Communities*, 576 U.S. at 527.

10    154.    HUD's only explanation is to deny that it is changing the law, even as it confirms that it

11    is. With respect to its removal of the 2013 Rule's "perpetuation of segregation" language, HUD

12    explained that it removed this definition as part of "streamlining" the regulation. Final Rule, 85 Fed.

13    Reg. at 60306. It continued: "A plaintiff need only prove in a case brought under disparate impact

14    theory that a policy or practice has led to the perpetuation of segregation, *which has a discriminatory*

15    *effect* on members of a protected class." *Id*. (emphasis added). Furthermore, it continued, "HUD views

16    'perpetuation of segregation' as a possible harmful result of unlawful behavior under the disparate

17    impact standard." *Id.* That is, HUD acknowledges that the perpetuation of segregation can *lead* to

18    discriminatory results, or can be the downstream result of a policy that is *otherwise* unlawful. But its

19    explanation confirms that HUD no longer believes a policy that causes the perpetuation of segregation

20    is discriminatory and potentially unlawful *for that reason alone*, and has altered its regulation to reflect

21    that view.

22    155.    This change in the law misunderstands and is inconsistent with decades of FHA

23    jurisprudence, including *Inclusive Communities*. Federal courts—as early as *Black Jack*, and in a line

24    of cases since—have consistently and properly recognized that a policy's perpetuation of segregation

25    remains a basis for liability without a separate showing that the policy *also* has a differential impact

26    based on protected class. As *Inclusive Communities* put it, "the FHA aims to ensure that those

27    [legitimate] priorities can be achieved without arbitrarily creating discriminatory effects *or*

28

- 42 -

COMPLAINT
National Fair Housing Alliance, Fair Housing Advocates of Northern California, and BLDS, LTD d/b/a BLDS, LLC v. Ben Carson and U.S. Department
of Housing and Urban Development

1  perpetuating segregation." *Inclusive Communities*, 576 U.S. at 540 (emphasis added). The rule thus

2  blatantly conflicts with the very Supreme Court case that HUD purports to implement.

3      156.    HUD's explanation is equally unreasoned with respect to the removal of language

4  recognizing that a claim based on a "predictable" disparate impact may succeed. HUD eliminates this

5  language from the Final Rule, even as it recognizes in the preamble to the Final Rule that such claims

6  "may succeed" and that *Inclusive Communities* "does use the phrase 'caused or predictably will cause

7  a discriminatory effect' when discussing the prima facie burden for discriminatory effect plaintiffs." 85

8  Fed. Reg. at 60307. HUD provides no explanation for removing language that it concedes is consistent

9  with established Supreme Court precedent.

10      157.    Deleting this language from the Final Rule will cause confusion and uncertainty among

11  courts and litigants, who will try to discern the meaning behind HUD's decision to include this

12  language in the 2013 Rule and then remove it in the 2020 Rule. Commenters identified these problems

13  for HUD, but HUD did not provide reasoned responses.

14                    *    *    *

15      158.    The cumulative effect of all these changes the Final Rule makes is to effectively render

16  disparate impact under the Fair Housing Act toothless. By changing pleading and evidentiary

17  standards, and fashioning wholly new defenses, the Final Rule undermines the Act's ability to continue

18  its historic role of confronting and reducing structural inequalities in the housing market.

19  **IV.**    **The Final Rule's Gutting of Disparate-Impact Law Is Based on Erroneous Reading of**

20          **Supreme Court Precedent And Is Otherwise Unlawful**

21      159.    As described above, the Final Rule has many provisions that are unlawful for reasons

22  individual to each. But more fundamentally, the Final Rule is defective as a whole, because it is based

23  on the overarching premise that the Supreme Court's 2015 decision in *Inclusive Communities*—a

24  decision that *upheld* existing disparate-impact doctrine—somehow requires HUD to gut that doctrine

25  in response. That faulty premise results in a cascade of legal errors, from failing to offer adequate

26  explanation for abruptly changing the law to failing to account for all the costs that will flow from

27  doing so.

28

**A.      The Final Rule's Gutting of Disparate Impact Is Based on the Faulty Premise that** *Inclusive Communities* **Changed Disparate-Impact Law**

160.      HUD does not dispute that its 2013 Rule correctly codified disparate-impact doctrine as it existed at that time, in the form of case law and long-standing HUD interpretations. And HUD takes no issue with any aspect of its 2013 Rule as a matter of policy. It does not contend that the 2013 Rule (or the longstanding case law and agency practice that it codifies) caused any real-world problems or that its proposed changes would lead to policy outcomes that better reflect the Fair Housing Act's purposes.

161.      Instead, HUD set this rulemaking in motion and then finally justifies its sweeping changes by claiming that *Inclusive Communities* somehow requires them. *See* Proposed Rule, 84 Fed. Reg. at 42857 ("These amendments are intended to bring HUD's disparate impact rule into closer alignment with the analysis and guidance provided in *Inclusive Communities* as understood by HUD . . . ."); Final Rule, 85 Fed. Reg. at 60288 ("This rule amends HUD's 2013 disparate impact standard regulation to better reflect the Supreme Court's 2015 ruling in [*Inclusive Communities*]"). But *Inclusive Communities* does no such thing. Most of HUD's "reasoning" amounts to severe misreading of snippets of *Inclusive Communities* taken out of context and assigned a meaning they do not have in the case itself.

162.      Far from announcing or calling for any changes in the law, *Inclusive Communities* repeatedly stated that it was describing *existing* law:

- The Court explained that "disparate-impact liability *has always* been properly limited in key respects that avoid the serious constitutional questions that might arise under the FHA." *Inclusive Communities*, 576 U.S. at 540 (emphasis added).

- The Court discussed at length the 2013 Rule—including its requirements for making out a prima facie case and burden-shifting—without suggesting that the Rule required revision. *See, e.g.*, *id.* at 525-27 (describing prima facie case and burden-shifting in the 2013 Rule); *id.* at 2522-23 (describing defendants' burden "to state and explain the valid interest served by their policies" and HUD's decision in 2013 Rule not to use term "business necessity" in formulating

1      defendant's burden); *id.* at 541 (after describing concerns raised by specific claim at issue in

2      case, observing with approval that HUD's 2013 rule "does not mandate that affordable housing

3      be located in neighborhoods with any particular characteristic") (quoting 2013 Rule, 78 Fed.

4      Reg. at 11476).

5    •   The Court cited numerous lower-court disparate-impact cases with approval, without

6      suggesting they were litigated under an improper standard. *See, e.g., id.* at 539-40 (citing cases

7      involving "zoning laws and other housing restrictions that function unfairly to exclude

8      minorities from certain neighborhoods without any sufficient justification" as "resid[ing] at the

9      heartland of disparate-impact liability").

10   •   The Court observed, as one of its rationales for affirming the availability of disparate-impact

11     liability, that "residents and policymakers have come to rely on the availability of disparate-

12     impact claims." *Id.* at 546.

13   •   The Court noted that the existence of disparate-impact claims "for the last several decades 'has

14     not given rise to . . . dire consequences.'" *Id.* (quoting *Hosanna-Tabor Evangelical Lutheran*

15     *Church and School v. EEOC*, 565 U.S. 171, 196 (2012)).

16    163.    This is not the language of a Court *changing* existing law; it is the language of a Court

17 *describing* existing law (and ultimately affirming it). HUD ignores all this language.

18    164.    HUD took the position in 2016 and in 2017 that *Inclusive Communities* did not change

19 disparate-impact law. *See* ¶ 76, *supra*. It has offered no reasoned explanation for its reversal in

20 position.

21    165.    At its core, the Final Rule attempts to undo *Inclusive Communities*, not to implement it.

22 It takes a decision that *upheld* disparate-impact doctrine and misleadingly quotes from it to justify the

23 *destruction* of disparate-impact law.

24    **B.**    **HUD Lacks Authority to Change Pleading Standards, Burdens of Proof, or Other**
             **Litigation Requirements**
25

26    166.    Compounding that overarching error, rather than simply articulating the manner in

27 which HUD's substantive construction of the Fair Housing Act has changed, the Final Rule purports to

28

COMPLAINT
National Fair Housing Alliance, Fair Housing Advocates of Northern California, and BLDS, LTD d/b/a BLDS, LLC v. Ben Carson and U.S. Department
of Housing and Urban Development

1   amend pleading standards, reallocate burdens of proof, and create artificial exemptions and affirmative

2   defenses to FHA liability. Congress has not delegated to HUD the authority to make these types of

3   changes.

4   167.   In particular, HUD has no authority to fashion defenses that appear nowhere in the text

5   of the Fair Housing Act. Indeed, HUD concedes as much in rejecting a proposal that it create *other*

6   defenses, stating—correctly—that it "does not have the authority to create new exceptions under the

7   Fair Housing Act." Final Rule, 85 Fed. Reg. at 60331. Yet that is exactly what HUD does in the Final

8   Rule.

9   168.   HUD also lacks authority to erect new pleading standards, such as the requirement to

10   plead that a policy is "artificial, arbitrary, and unnecessary." New 24 C.F.R § 100.500(b)(1). Rather, it

11   is the Supreme Court that is responsible for establishing pleading standards under the Rules Enabling

12   Act, 28 U.S.C. § 2072 (1934), and the Federal Rules of Civil Procedure. All these new pleading

13   requirements thus are contrary to law and—because HUD entirely fails to justify them (except to

14   erroneously claim they are *already* the law)— they are arbitrary and capricious as well.

15   **C.   HUD Failed to Consider or Address the Costs and Burdens Imposed by the Final
       Rule**

16

17   169.   HUD failed to acknowledge or adequately explain the burdens and complications it

18   created by promulgating standards inconsistent with overlapping laws and regulatory guidance.

19   170.   For example, the Final Rule creates disparate-impact standards that are inconsistent

20   with those applicable under the Equal Credit Opportunity Act (ECOA), notwithstanding that many

21   lenders and others are governed with both laws. It also is inconsistent with longstanding agency

22   guidance for regulated entities, such as the 1994 Joint Policy Statement on Discrimination in Lending,

23   which applies to lending discrimination under both the FHA and ECOA and was signed by HUD, the

24   Department of Justice, and nine other federal regulatory and enforcement agencies.[15]

25

26   _____

27   [15] Interagency Task Force on Fair Lending, *Policy Statement on Discrimination in Lending*, 59 Fed. Reg. 18,266 (Apr. 15, 1994), https://www.federalregister.gov/documents/1994/04/15/94-9214/policy-statement-on-discrimination-in-lending-notice-department-of-housing-and-urban-development.

28

1       171.    HUD's 2013 Rule acknowledged the importance of avoiding inconsistent disparate-

2   impact regimes, both for compliance and for litigation, and was drafted to avoid such an outcome. *See,*

3   *e.g.*, 2013 Rule, 78 Fed. Reg. at 11482 ("in litigation involving claims brought under both the Fair

4   Housing Act and ECOA, the parties and the court will not face the burden of applying inconsistent

5   methods of proof to factually indistinguishable claims. Having the same allocation of burdens under

6   the Fair Housing Act and ECOA will also provide for less confusion and more consistent decision

7   making by the fact finder in jury trials."). Yet the Final Rule splits FHA law from ECOA law and years

8   of agency guidance in all the ways described above. Institutions subject both to ECOA and the FHA,

9   including all mortgage lenders, are faced with conflicting regimes and inconsistent agency positions.

10      172.    Commenters pointed out the burdens and uncertainty HUD proposed to create,

11   especially for those situations governed by both ECOA and the FHA. HUD offered no reasoned

12   response.

13      173.    The Final Rule also lacks any discussion of the costs of the changes it makes. As

14   commenters explained, HUD's changes increase costs for entities—among them affordable housing

15   developers, small businesses, governmental jurisdictions, and not-for-profits, such as those that run

16   group homes for people with disabilities—that rely on the ability to bring disparate-impact litigation

17   and HUD complaints where necessary to vindicate their rights.

18  **V.**    **HUD's Final Rule Will Harm Plaintiffs**

19      **A.**    **Harm to NFHA**

20      174.    The 2020 Rule harms both NFHA and its members. Accordingly, NFHA sues both on

21   its own behalf and on behalf of its members.[16]

22      175.    NFHA's mission is to promote residential integration, combat discrimination in

23   housing, and ensure equal housing opportunity for all people.

24

25

26

27

---

28  [16] A declaration describing the harm to Plaintiff NFHA can be found in Ex. B, Decl. of L. Rice (Oct. 21, 2020).

176.     NFHA carries out this mission through, among other things, education, outreach, membership services, public policy initiatives, consulting and compliance, community development, advocacy, and enforcement.

177.     NFHA works with industry players, such as banks, insurance companies, and others whose activities impact the availability of housing, to make their policies and practices less discriminatory. Since its inception, NFHA has supported and engaged in work to encourage and, where necessary, require financial institutions, insurance companies, housing providers, real estate agencies, and others to modify practices that have an unnecessary disparate impact on communities of color and others who have historically been excluded from equal access to housing opportunities.

178.     As described above, NFHA and its members have used disparate-impact law to compel insurance companies to drop policies that had the effect of redlining communities. They also have used disparate impact to address the discriminatory maintenance and management of bank-owned homes in communities of color, resulting in over $56 million in revitalization investments and other important benefits in these areas. And those are just two of the many examples of NFHA and its members using disparate impact to further their fair housing missions.

179.     The desire to avoid potential liability provides an important incentive for corporations to work with NFHA in good faith to determine whether their policies and practices create unnecessary disparate impact and explore less discriminatory alternatives. Well-established disparate-impact law, as set forth in HUD's 2013 Rule and in case law, has greatly facilitated the ability of NFHA and its members to advocate for fairer policies and otherwise further fair housing objectives.

180.     Sometimes NFHA, through its compliance or outreach activities, can convince industries to change their practices voluntarily, relying on the leverage that disparate-impact law provides. Sometimes it must sue one or more industry members, or it must file a complaint with HUD. Either way, existing disparate-impact law empowers NFHA to carry out its mission effectively. And, as outlined above, the HUD complaint process has, until now, provided a way to articulate a disparate-impact complaint in a relatively efficient way, consistent with longstanding case law, that permits all parties to discuss resolution quickly.

181.    Once NFHA succeeds in getting one company to implement less discriminatory alternatives, thereby demonstrating that these alternatives do not inhibit the ability to accomplish legitimate ends, the disparate-impact doctrine creates an incentive for others in the industry to follow suit. They do so in part to avoid liability, but also because they see that adopting the less discriminatory alternative is not detrimental to business interests and often results in a win-win, providing a company with more customers rather than fewer. Many companies reflexively refuse to consider less discriminatory alternatives until they see that those alternatives are perfectly consistent with their legitimate needs and may even be in their best interests.

182.    In this manner, NFHA relies on disparate-impact law to promote fair housing throughout entire industries efficiently and effectively.

183.    HUD's changes to the disparate-impact standard will reduce NFHA's leverage with industry players and make it more difficult for NFHA to promote fair housing. Lenders, insurance companies, landlords, and others that would change discriminatory policies if facing an evident risk of liability will not readily do so if they perceive no such risk. This will interfere with NFHA's ability to conduct its activities, and to do so successfully. People in the communities that NFHA serves will be harmed because of NFHA's reduced ability to vindicate their fair housing rights.

184.    Under the Final Rule, challenging a policy that has unjustified disparate impact will be much more difficult and expensive—where it is even still possible— because the Rule requires considerably more information to be gathered and analyzed before a complaint can be filed, whether in federal court or before HUD. NFHA will have to scale back the number of complaints it files, assist fewer victims of discrimination, and expend considerably more resources to maintain the same level of effectiveness. People whose rights would otherwise be protected by NFHA's activities will be harmed because their rights will be violated with impunity.

185.    NFHA's mission will be impaired and frustrated by the Final Rule's interference with its fair housing work and the consequent harm to members of the communities that NFHA serves.

186.    NFHA already has had to divert considerable resources from other important projects to activities designed to counteract the effects of HUD's rule. In particular, it has had to expend resources

1    to educate and help its members educate various entities that had complied with disparate-impact law

2    to avoid legal risk under the Fair Housing Act, but no longer perceive themselves to face substantial

3    risk because of the Final Rule, on the benefits of continuing, now voluntarily, to comply with

4    traditional disparate-impact law. It would not have to expend resources in this way if HUD had not

5    undercut the clear legal obligation for those entities to do so.

6         187.   In particular, HUD's action directly undermines and interferes with one of NFHA's

7    most important current projects, which it calls the Tech Equity Initiative. This project will encourage

8    the lending and housing industries and others using predictive models to use a NFHA-developed

9    platform to robustly test their models for discriminatory impact and modify them as necessary to lessen

10   that impact and achieve fairer results. By dramatically reducing the relevance of the availability of less

11   discriminatory alternatives, and by providing predictive methods with an additional layer of insulation

12   from liability, the Final Rule eliminates a large part of the incentive for companies to do so.

13        188.   Ensuring the fairness of policies based on algorithmic models is the next frontier of fair

14   housing. Such models are increasingly being used to drive the decision-making of financial

15   institutions, real estate marketing and search firms, property insurers, and other entities whose

16   decisions affect the availability of housing and the terms on which it is available. Unfortunately, many

17   of the models currently used—as well as those in development—systematically generate results that

18   are discriminatory based on race or other protected class, threatening to entrench housing

19   discrimination on a large scale.

20        189.   Accordingly, NFHA has invested resources—in money and staff-time—to developing

21   the Tech Equity Initiative in response. This initiative relies on the long-established disparate-impact

22   standard to drive the various industries that affect the housing market to reduce the discriminatory

23   impact of the models they use for decision-making.

24        190.   NFHA is in the process of developing an automated tool to assess the disparate impact

25   of models that it can make widely available. Companies involved in the housing market, such as

26   financial institutions and insurance companies, will be able to upload their models—or, in the case of

27   companies concerned about the exposure of proprietary information, dummy versions that operate

28

1    substantially similarly—and see the disparate impact those models likely will cause and the ability of

2    debiasing tools to reduce that impact.

3        191.    By using this tool, which NFHA calls a debiasing sandbox, companies will have a

4    common space to test different methodologies for reducing discriminatory outcomes. They will have

5    the opportunity to see how these debiasing tools can make their models less discriminatory while

6    serving legitimate ends, and then can determine which debiasing methodologies best serve their and

7    their clients' needs.

8        192.    NFHA's tool will help and encourage individual companies to reduce the disparate

9    impact that their models cause, and its widespread use will generate considerable data about how the

10   use of models affects the housing market. NFHA plans to analyze this data for lessons about the

11   efficacy of various debiasing tools, publish results, and convene forums for further discussion and

12   research. The end results of this project are expected to include increased transparency around how

13   models reach results and the advancement of research on how to reduce bias in new technologies.

14       193.    All these plans are predicated on the continued existence of a real risk of disparate-

15   impact liability to motivate various entities to participate. Many companies will not participate unless

16   they believe failing to do so exposes them to legal risk, and HUD's rule largely eliminates that risk.

17       194.    By eliminating the incentive for companies to participate in NFHA's program, HUD's

18   Rule diminishes the effectiveness of the Tech Equity Initiative as a whole. The program has great

19   potential to make the housing market fairer—while also making models more effective at their

20   legitimate purposes—but only if enough companies participate.

21       195.    HUD's change to the disparate-impact standard has forced NFHA to divert resources it

22   otherwise would not need to spend to encourage industry players to participate and to educate them

23   and the public about the importance of analyzing models to avoid unnecessary disparate impact. Put

24   simply, it has had to expend resources to convince the players that shape the housing market to do

25   voluntarily what, until the Final Rule, they were required to do by law. It will need to continue to do so

26   indefinitely so long as the Final Rule remains in effect.

27

28

196.   As a result of this continuing diversion of resources, NFHA has had to curtail or forego entirely a variety of planned activities.

197.   In particular, NFHA has been forced to divert resources from the roll-out of the Tech Equity Initiative described above, delaying that important program.

198.   NFHA also has been forced to divert resources from, and thereby must delay, the planned roll-out of its Keys Unlock Dreams Initiative. This initiative is a coordinated partnership between NFHA, its members, and local communities and stakeholders to educate municipalities about the link between racism, public health, and housing policies, and work jointly towards solutions that address those challenges. NFHA, its members, and partnering organizations and companies have been able to convince some municipalities to, among other things, declare racism to be a public health crisis and focus on the racial disparities in how communities experience the COVID-19 pandemic. NFHA has had to push back full implementation of the Keys Unlock Dreams Initiative to prevent backsliding across the board in fair housing compliance as a result of the Final Rule.

199.   The bottom line is that, in the absence of the Final Rule, NFHA was prepared to take advantage of this historic moment when much of the country is newly engaged in discussions of systemic racial inequities. Because of the Final Rule, it has been forced to divert resources to ensuring bare compliance with what had been clear Fair Housing Act obligations but now are perceived by many regulated entities as mere unenforceable suggestions.

**B.     Harm to NFHA's Members**

200.   NFHA also sues on behalf of its members, many of which are greatly harmed by HUD's gutting of disparate-impact liability. NFHA members are small, local non-profits that lack significant resources. Like NFHA, promoting residential integration and combating discrimination in housing based on race, national origin, disability, and other protected classes covered by federal, state, and local fair housing laws is central to their missions. The Final rule makes it more difficult and more expensive for NFHA members to carry out their core activities effectively.

201.   NFHA members counsel and represent individuals affected by discriminatory housing practices. They also advocate for state and local jurisdictions, housing providers, lenders, and others to

1   modify policies that have a discriminatory effect and assist in the identification and implementation of

2   less discriminatory alternatives. They educate players in the housing market, public officials,

3   community leaders, and others on practices that cause discriminatory effects in housing and available

4   alternatives that can make the housing market fairer.

5        202.   NFHA members have filed many HUD complaints regarding practices that have

6   unjustified discriminatory effects. Until now, HUD has not required an extensive pleading to initiate

7   this process, which triggers HUD investigation and allows additional information to be obtained. HUD

8   guidance regarding the application of disparate-impact analysis to common fact patterns, such as

9   criminal records bans in rental housing, has further streamlined the process for NFHA members by

10   setting forth exactly what they need to plead to trigger HUD's duty to investigate. Particularly because

11   they lack the resources to do extensive pre-filing investigation, the HUD complaint and resolution

12   process has provided NFHA members with an effective and efficient means to enforce the Fair

13   Housing Act.

14        203.   The Final Rule dramatically increases the burden of filing a disparate-impact complaint

15   with HUD. It will now require more investigation than previously was required to file in federal court.

16   Moreover, NFHA members will no longer be able to rely on previously clear guidance regarding

17   HUD's views on certain practices because HUD states in the Final Rule that it will be reconsidering

18   prior guidance due to the content of the Final Rule.

19        204.   Thus, the Final Rule substantially diminishes, if not eliminates altogether, the utility of

20   HUD complaints and administrative enforcement. NFHA members will be significantly less able to

21   effectively enforce the Fair Housing Act.

22        205.   What enforcement options remain available to them will require spending considerably

23   more resources on pre-filing investigations, forcing them to divert resources from other projects to

24   meet the new, much higher pleading standards. NFHA members will not be able to challenge at all

25   many of the discriminatory practices brought to their attention, due to the much heavier burden the

26   Final Rule imposes.

27

28

206.    NFHA members will also be less able to fulfill their missions by persuading companies and government jurisdictions in their area to make their policies less discriminatory because of the reduced risk of disparate-impact liability.

207.    The Final Rule also introduces considerable confusion into what had been well-settled law. It will force NFHA members to engage in considerable revision of training and educational materials, at great expense. When HUD changes the law so drastically—and in, some respects, incomprehensibly—the responsibility falls on entities like NFHA members to translate that change into guidance that can be applied on the ground by real people.

208.    By thus impairing their activities, the Final Rule harms NFHA members' clients and communities and impairs NFHA members' ability to achieve their goals.

209.    The Final Rule will also create an added burden for NFHA members by making it virtually impossible for most individuals to file their own HUD complaint, due to added complexity and hurdles. Members will need to devote additional resources to assisting or taking on representation of additional individuals because they no longer can simply refer individuals to the HUD process without further involvement. Those resources will need to be diverted from members' other important activities.

210.    Many NFHA members are hurt in these ways by the 2020 Rule. In a recent survey of 45 NFHA members, 31 reported that they currently are handling a case involving disparate-impact claims. The following are just three examples.

211.    The Housing Equality Center of Pennsylvania is a NFHA member operating in Bucks, Chester, Delaware, Lehigh, Montgomery, and Northampton Counties, PA, as well as in Philadelphia.

212.    The Housing Equality Center currently has a complaint pending before HUD alleging that a landlord applies three separate exclusionary policies, each of which has a disparate impact based on protected class. For example, the landlord uses an overly broad criminal history exclusion, which disproportionately and unnecessarily excludes Black prospective tenants who should be qualified for tenancy.

213.    The Housing Equality Center is currently preparing other disparate-impact complaints for filing before HUD or in federal court.

214.    The Fair Housing Center of Central Indiana is a non-profit organization and NFHA member that serves 24 counties in central Indiana.

215.    The Fair Housing Center is currently litigating four Fair Housing Act complaints that have disparate-impact claims in federal courts. It is also preparing to file at least one complaint with HUD that will include a disparate-impact claim. It has recently settled another such complaint that was filed with and processed by HUD.

216.    Housing Opportunities Made Equal of Virginia ("HOME") is a non-profit organization and a NFHA member. The oldest fair housing organization in the country, HOME has a long history of bringing fair housing cases with disparate-impact claims in federal court and in agency proceedings. Relying in part of HUD's 2013 Rule and subsequent guidance on the use of criminal records, HOME has successfully litigated two claims in the past two years regarding landlords' use of overbroad criminal record restrictions that unnecessarily excluded people of color from housing opportunities.

217.    HOME is actively investigating several other cases it expects to file with HUD for investigation in the near future.

**C.    Harm to FHANC**

218.    FHANC is a nonprofit fair housing agency operating in Marin County and elsewhere in Northern California. Its mission is to ensure equal housing opportunity in the community that it serves. FHANC seeks to promote racially integrated communities and neighborhood diversity. FHANC is harmed by the Final Rule.[17]

219.    FHANC furthers its mission by counseling residents of the communities it serves about their fair housing rights and how to vindicate those rights; providing community education programs that inform residents of their fair housing rights; working with advocates, housing providers, tenants, homeowners, homebuyers, social service providers, and others to protect the fair housing rights of the

---

[17] A declaration describing the harm to Plaintiff FHANC can be found in Ex. C, Decl. of C. Peattie (Oct. 21, 2020).

1   clients and communities that they and FHANC both serve; training housing providers and other real

2   estate professionals how to comply with fair housing laws; filing administrative complaints with HUD

3   on behalf of FHANC and the clients and communities they serve; and litigating in court.

4   220.   In its fiscal year 2019, FHANC served nearly 5,000 tenants, homeowners, homebuyers,

5   housing providers, children, social service providers, and advocates. Ninety percent were low-income.

6   Half of the people it served were Black or Latinx. Many spoke little or no English.

7   221.   As part of its work, FHANC works to change rules, policies and practices that have a

8   significant disproportionate adverse impact on communities of color, families with children, and other

9   marginalized groups protected under the Fair Housing Act. FHANC counsels its clients and client

10   communities about how disparate impact law can be used to require less discriminatory alternatives to

11   policies that have discriminatory and segregative effects. Policies and practices that have significant

12   disproportionate adverse impact on the client communities that FHANC serves include occupancy

13   restrictions; criminal records bans on those seeking housing; source of income restrictions (including

14   restrictions on those seeking to use Section 8 vouchers); bank policies that have the effect of redlining

15   minority communities or targeting those communities for predatory practices; policies that result in the

16   eviction of survivors of domestic violence from their homes; and practices that result in the

17   deterioration of foreclosed properties in communities of color. These are just some of the policies,

18   rules and practices that impede fair housing in FHANC's service area and that FHANC works to

19   change.

20   222.   FHANC's efforts to combat these discriminatory practices are not just limited to

21   counseling clients and the communities it serves. FHANC files administrative complaints and federal

22   litigation on behalf of these clients and client communities that use disparate-impact law to challenge

23   these practices and require less discriminatory alternatives. It advocates with housing providers, social

24   service agencies, and local governments about how to comply with disparate-impact law in ways that

25   promote its fair housing mission.

26   223.   In addressing these issues and practices, FHANC relies on well-settled law, as set forth

27   in the 2013 Rule and applied for decades by courts, HUD, and state and local governments, to protect

28

COMPLAINT
National Fair Housing Alliance, Fair Housing Advocates of Northern California, and BLDS, LTD d/b/a BLDS, LLC v. Ben Carson and U.S. Department
of Housing and Urban Development

1  fair housing rights and pursue its mission. This is critical to the organization's efforts.  HUD's Final

2  Rule will significantly interfere with FHANC's ability to conduct these activities and provide these

3  services successfully.

4       224.    Core aspects of FHANC's work will be upended, curtailed, or made significantly more

5  difficult by HUD's radical revision of well-established disparate-impact law and requirements.

6       225.     HUD's action makes it much more difficult, and frequently impossible, for FHANC to

7  file and prevail in lawsuits and administrative complaints.  Without an effective enforcement

8  mechanism, FHANC's leverage in advocating for clients and client communities will be greatly

9  diminished.

10      226.    FHANC will need to spend vastly more time and resources to explicate the confusing

11  and unclear aspects of the new Rule and what remains of fair housing obligations to clients, client

12  communities, and others that depend on FHANC to be an authoritative source of fair housing

13  information. The effectiveness of its counseling, training, and education programs will be severely

14  compromised as well. FHANC will not be able to show individuals that they have strong and

15  enforceable fair housing rights, making it much harder for FHANC's programs to accomplish the

16  purpose of empowering people to vindicate their rights and leaving many people unable to protect

17  those rights. Housing providers, meanwhile, will see that they are unlikely to be penalized for

18  maintaining policies with unnecessary disparate impact, or even for discriminating intentionally,

19  undercutting FHANC's ability to use training of housing providers to further fair housing compliance.

20      227.    FHANC is already receiving requests for assistance from potential clients whose cases

21  are now more difficult if not impossible to resolve favorably because of the Final Rule. These cases

22  present familiar situations, such as buildings that exclude people with criminal records unnecessarily or

23  that evict survivors of domestic violence pursuant to overbroad eviction policies that FHANC could

24  readily resolve prior to the Final Rule.

25      228.    This interference with and impairment of FHANC's ability to perform the fair housing

26  work described above will significantly harm FHANC's clients and the communities it serves. There

27  will be no redress for many violations of clients' and community members' fair housing rights because

28

COMPLAINT
National Fair Housing Alliance, Fair Housing Advocates of Northern California, and BLDS, LTD d/b/a BLDS, LLC v. Ben Carson and U.S. Department
of Housing and Urban Development

1 the disparate-impact law that is crucial to FHANC's ability to achieve voluntary or compulsory

2 compliance will be eviscerated in so many critical respects. The lack of redress will, furthermore,

3 cause more violations to occur as landlords and others discover that they can easily avoid liability

4 despite discriminating.

5    229. These direct consequences of the Final Rule will impair FHANC's ability to accomplish

6 its mission of ensuring equal housing opportunities and promoting racially integrated communities and

7 neighborhood diversity. They will cause a substantial setback to and frustration of that mission.

8 Redressing the frustration to its mission going forward will require the investment and expenditure of

9 significant new resources by FHANC to forestall and counteract conduct and violations that would not

10 occur but for the Final Rule.

11    230. The Final Rule will cause FHANC to divert its limited resources from investigations,

12 representations, and other mission-related activities that it would otherwise engage in. FHANC will

13 need to expend more resources to explain the new rule to clients and client communities and otherwise

14 counsel clients about their fair housing rights, and it likewise will have to expend more resources to

15 pursue the work that is undermined by the Final Rule.

16    231. For example, significantly more factual development will be required to file a lawsuit or

17 administrative complaint that is not quickly dismissed, or to compile a strong enough case to succeed

18 in informal advocacy with landlords. Clear violations that formerly could be remedied quickly are

19 already taking longer to resolve. In each part of its operations, FHANC will have to expend more staff

20 time and funds than previously, and so it will be able to serve fewer members of the community

21 because of this diversion of its resources.

22 **D.**  **Harm to BLDS**

23    232. The 2020 Rule dramatically reduces any enforceable obligation for lenders and other

24 companies to evaluate their practices for disparate impact and adopt less discriminatory alternatives

25

26

27

28

COMPLAINT
National Fair Housing Alliance, Fair Housing Advocates of Northern California, and BLDS, LTD d/b/a BLDS, LLC v. Ben Carson and U.S. Department
of Housing and Urban Development

1   that would accomplish their legitimate interests. In doing so, it undercuts BLDS's core business in a

2   way that causes direct and concrete economic harm.[18]

3        233.    BLDS is a consulting company that assists lenders and a variety of other entities in

4   performing statistical analysis.

5        234.    Among the core services BLDS provides is statistical analysis to determine whether

6   policies and practices have discriminatory effects and to identify available alternatives that would

7   mitigate such discriminatory effects. BLDS is among the national leaders in this field. Its work, and the

8   work of BLDS's experts before they joined BLDS, has been cited repeatedly in judicial opinions and

9   has formed the basis of many regulatory actions and corporate decisions and policies.

10       235.    BLDS's clients include institutions that engage in a variety of actions covered by the

11  Fair Housing Act, particularly with respect to the making of home loans for purchasing, constructing,

12  improving, repairing, or maintaining dwellings. BLDS has provided its services to both creditors and

13  non-creditors, including mortgage lenders, housing authorities, credit reporting agencies, and entities

14  that purchase mortgages on the secondary market. BLDS also advises parties that are contemplating

15  bringing or defending against disparate impact litigation, and its partners regularly serve as expert

16  witnesses in such litigation.

17       236.    Institutions hire BLDS to perform fair lending analyses in part because they are

18  concerned about liability risks under the traditional disparate-impact standard. They face risk if their

19  policies or practices cause discriminatory effects and they fail to adopt less discriminatory alternatives.

20  Many lenders and others whose actions affect the availability of housing have adopted rigorous

21  compliance functions that monitor policies for disparate impact and seek alternatives with less

22  discriminatory results. Such companies retain the assistance of BLDS to perform and assist with these

23  functions.

24       237.    To meet the needs of this market created by the traditional disparate-impact doctrine,

25  BLDS has created sophisticated proprietary tools and techniques. These tools and techniques allow

26

27  _____

28  [18] A declaration describing the harm to Plaintiff BLDS can be found in Ex. D, Decl. of B. Siskin (Oct. 16, 2020).

1    BLDS to assess whether policies have a disparate impact, such as disproportionately excluding people

2    of a certain race, and then identify whether potential alternatives exist that may have less

3    discriminatory effect while fulfilling the purposes of the model, *e.g.*, predicting the risk of loan default.

4         238.    BLDS's proprietary methods for assessing their clients' models track the elements of

5    well-established disparate-impact law. The market for its work is intrinsically bound up with

6    longstanding precedent and regulatory guidance. That market will dry up or disappear entirely under

7    the framework advanced in HUD's rule. Without the risk of traditional disparate-impact liability, these

8    institutions would not have the same incentive to retain BLDS to assess whether their policies and

9    practices disproportionately hurt protected classes or whether less discriminatory alternatives are

10   available.

11        239.    The Final Rule thus will directly reduce or destroy altogether a significant and

12   consistent existing source of revenue for BLDS.

13        240.    The Final Rule also will directly reduce the value of investments that BLDS has made

14   into the analysis of machine-learning models, including investments in proprietary software, that

15   otherwise are likely to produce significantly more revenue in the future.

16        241.    In the last few years, BLDS has devoted considerable resources to developing

17   proprietary methods for assessing traditional and machine-learning models to (1) determine whether

18   these models unnecessarily cause discriminatory outcomes and then (2) where necessary, develop

19   alternatives to these models that reduce discriminatory effect while fulfilling the models' purposes.

20        242.    These proprietary methods for reducing the discriminatory effect of models are of

21   considerable value so long as companies face risk for failing to comply with traditional disparate-

22   impact law. Indeed, companies that perform similar services are being valued at millions of dollars by

23   investors. BLDS's methodology is implemented in easy to use and cost-effective ways that would be

24   of great use to regulators and to creditors applying the traditional disparate-impact analysis. BLDS

25   reasonably anticipates this being one of its core growth areas, and so it has invested much time and

26   money into developing methods that will make it an industry leader. These investments were made in

27   reliance on existing, consistent disparate-impact law.

28

COMPLAINT
National Fair Housing Alliance, Fair Housing Advocates of Northern California, and BLDS, LTD d/b/a BLDS, LLC v. Ben Carson and U.S. Department
of Housing and Urban Development

243.     HUD's gutting of disparate-impact law would radically change the regulatory environment, and the value of these proprietary methods would be much reduced. The traditional questions addressed by disparate-impact analysis—whether a model or other policy unnecessarily excludes people in protected classes, and whether a less discriminatory alternative is available—would no longer have relevance.

244.     BLDS's clients and prospective clients are sophisticated entities that pay close attention to their legal and regulatory risk and spend money accordingly. By making robust analysis of the type that BLDS performs unnecessary, the Final Rule will lead to a significant downturn in BLDS's current work and the loss of a major anticipated revenue stream in the future. It also will significantly reduce the value of BLDS's related intellectual property.

## CAUSES OF ACTION

### First Cause of Action

### Administrative Procedure Act – Agency Action That is Arbitrary and Capricious

245.     Plaintiffs re-allege and replead all the allegations of the preceding and subsequent paragraphs and incorporate them herein by reference.

246.     The APA empowers this Court to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

247.     The Final Rule is final agency action.

248.     In promulgating the Final Rule, HUD failed to provide a reasoned explanation for reversing its prior positions.

249.     The Final Rule is not a product of reasoned decision-making, lacks support in the record, and will undermine the purposes of the Fair Housing Act.

250.     The Final Rule is unsupported by case law and conflicts with relevant jurisprudence.

251.     HUD failed to respond adequately to comments submitted in response to the Proposed Rule.

1    252.    The Final Rule is arbitrary, capricious, an abuse of discretion, and not in accordance with

2    law, in contravention of the APA.

3                                    **Second Cause of Action**

4        **Administrative Procedure Act – Agency Action in Excess of Statutory Authority**

5    253.    Plaintiffs re-allege and replead all the allegations of the preceding and subsequent

6    paragraphs and incorporate them herein by reference.

7    254.    The APA empowers this Court to "hold unlawful and set aside" agency action that is

8    "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C.

9    § 706(2)(C).

10   255.    In the Final Rule, HUD promulgated provisions that are outside its statutory rulemaking

11   authority.

12   256.    The Final Rule is in excess of statutory jurisdiction, authority, or limitations, or short of

13   statutory right, in contravention of the APA.

14                                    **Third Cause of Action**

15   **Administrative Procedure Act – Agency Action Without Observance of Procedure Required by Law**

16   257.    Plaintiffs re-allege and replead all the allegations of the preceding and subsequent

17   paragraphs and incorporate them herein by reference.

18   258.    The APA empowers this Court to "hold unlawful and set aside" agency action that is

19   taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

20   259.    The Final Rule contains provisions that did not appear in the Proposed Rule and are not

21   logical outgrowths of provisions that did appear in the Proposed Rule. HUD failed to give notice and

22   the opportunity for comment on provisions that it promulgated in the Final Rule.

23                                    **PRAYER FOR RELIEF**

24   WHEREFORE, Plaintiffs pray that this Court:

25          (a) Declare that HUD's Final Rule is arbitrary, capricious, an abuse of discretion, not in

26       accordance with law, taken without observance of procedure required by law, and in excess of

27       statutory authority;

28

1    (b) Vacate and set aside the Final Rule;

2    (c) Award Plaintiffs their reasonable attorneys' fees and costs under 28 U.S.C. § 2412; and

3    (d) Order such other relief as this Court deems just and equitable.

4
Dated: October 22, 2020
5                                              Respectfully Submitted,

6                                              /s/ Glenn Schlactus
7                                              JOHN P. RELMAN*
                                               REED COLFAX*
8                                              GLENN SCHLACTUS Bar No. 208414
                                               STEPHEN HAYES*
9                                              SASHA SAMBERG-CHAMPION*
                                               SARA PRATT*
10                                             ZACHARY BEST*
11                                             RELMAN COLFAX PLLC
                                               1225 19th St. NW, Suite 600
12                                             Washington, D.C. 20036
                                               Telephone: (202) 728-1888
13                                             Fax: (202) 728-0848
                                               jrelman@relmanlaw.com
14                                             rcolfax@relmanlaw.com
15                                             gschlactus@relmanlaw.com
                                               shayes@relmanlaw.com
16                                             ssamberg-champion@relmanlaw.com
                                               spratt@relmanlaw.com
17                                             zbest@relmanlaw.com

18                                             *Attorneys for all Plaintiffs*

19                                             AJMEL QUERESHI*
20                                             COTY MONTAG Bar No. 255703
                                               NAACP LEGAL DEFENSE &
21                                             EDUCATIONAL FUND, INC.
22                                             700 14th St. NW, Suite 600
                                               Washington, DC 20005
23                                             (202) 682-1300
                                               aquereshi@naacpldf.org
24                                             cmontag@naacpldf.org

25                                             *Attorneys for all Plaintiffs*

26                                             ALLISON M. ZIEVE*
27                                             PUBLIC CITIZEN LITIGATION GROUP
                                               1600 20th St. NW
28

- 63 -

COMPLAINT
National Fair Housing Alliance, Fair Housing Advocates of Northern California, and BLDS, LTD d/b/a BLDS, LLC v. Ben Carson and U.S. Department
of Housing and Urban Development

1
                   Washington, DC 20009
                   (202) 588-1000

2

3
                   *Attorney for all Plaintiffs*

4
                   MORGAN WILLIAMS*
                   NATIONAL FAIR HOUSING

5
                   ALLIANCE
                   1331 Pennsylvania Ave., NW, Suite 610

6
                   Washington, D.C. 20004
                   Telephone: (202) 898-1661

7
                   mwilliams@nationalfairhousing.org

8

9
                   *Attorney for Plaintiff National Fair Housing*
                   *Alliance*

10
                   JULIA HOWARD-GIBBON Bar No. 321789

11
                   FAIR HOUSING ADVOCATES OF
                   NORTHERN CALIFORNIA

12
                   1314 Lincoln Ave., Suite A
                   San Rafael, CA 94901

13
                   (415) 483-7516
                   julia@fairhousingnorcal.org

14

15
                   *Attorney for Plaintiff Fair Housing Advocates*
                   *of Northern California*

16

17
                   * *Pro Hac Vice Application Forthcoming*

18

19

20

21

22

23

24

25

26

27

28