# EXHIBIT A

## DECLARATION OF JEFFREY B. JAFFEE

I, Jeffrey B. Jaffee, hereby state as follows:

1. I am over the age of eighteen and am competent to make this Declaration. I have personal knowledge of the matters set forth herein.

### Background and Experience

2. I have worked in consumer lending and compliance since 1983 for some of the country's largest financial institutions. I am currently Director of Consumer Protection Compliance at Freddie Mac. I assumed this position earlier this year.

3. From 2014 until joining Freddie Mac, I was Head of Protecting the Interests of Clients Compliance, Responsible Banking and Fair Lending at Bank of the West.

4. I was the Chief Regulatory Affairs Officer at CitiMortgage from 2011 to 2014.

5. From 2009 to 2011, I served as the Vice President of Consumer and Community Affairs at Saxon Mortgage.

6. Before joining Saxon Mortgage in 2009, my positions included principal in a compliance consulting firm from 2008 to 2009, the Community Reinvestment Act Director for Mortgage Sales at CitiBank from 1997 to 1999, and the Community Reinvestment Act Fair Lending Director at CitiBank from 2002 to 2005. I also held other positions at Citibank in mortgage and branch management.

7. I am a graduate of Georgetown University.

8. During my 37 years at the financial institutions identified above, I have been responsible for advising business management and leaders about the requirements of fair lending and other consumer protection laws. I have worked closely with and/or managed in-house compliance teams, business units responsible for designing, marketing and operating a wide

range of credit products, third party consultants and experts, and outside legal counsel. In these roles I gained considerable knowledge about how the financial services industry works, the legal obligations it must meet, and the practices it must follow if it is to fulfill its obligations to consumers and shareholders.

## Compliance with Disparate Impact

9. As a result of my many years in the financial services industry, I am very familiar with how many of the country's leading banks and other lenders have addressed and been affected by disparate impact legal requirements under the federal Fair Housing Act ("FHA"), the federal Equal Credit Opportunity Act ("ECOA"), and other laws.

10. Careful attention to compliance with disparate impact has been good for business because it has made lending institutions better at identifying qualified borrowers in all communities, especially ones that historically have been underserved. This is directly attributable to disparate impact's emphasis on searching for less discriminatory alternatives.

11. Because of socioeconomic and other disparities across the country, members of groups that are protected under fair lending laws like the FHA are sometimes disproportionately adversely affected by facially neutral policies and practices that lenders use to qualify consumers for services and products. Disparate impact requires lenders to look closely to see if that is the case. When it is, responsible lenders use objective data to determine whether the policy or practice in question is more restrictive than necessary to meet their legitimate business needs. If they find that a policy or practice excludes more people in protected classes than necessary to maintain a safe and sound business, disparate impact requires them to look for a less discriminatory alternative. If, employing reasonable efforts, they find one, they adjust the policy or practice to be more inclusive.

12. In this way, policies and practices in the industry have, over the last 30 years, become much better at finding and serving qualified customers in all markets, including underserved communities, without sacrificing important business needs and goals. Using disparate impact, the financial services industry has been able to reach more customers in all markets without taking on greater risk or sacrificing profit. Put simply, disparate impact has helped us meet the goals of both fairness and profit. It has helped us to serve consumers and shareholders alike.

13. For example, many banks use underwriting models to predict a borrower's ability to repay a loan and make mortgage payments on time. Some models rely on variables that have a significant adverse impact on African Americans, or other members of a protected group. Where that is the case, the disparate impact rule requires lenders to search for alternative variables that, if substituted for those causing the impact, result in less impact without reducing the predictive power of the model. Including a variable in an underwriting model that looks at, for example, rental payment history may, in some instances, result in finding more qualified African-American borrowers and actually improve the predictive power of the model in terms of identifying risk. This is just one example of many possible alternative or substitute variables that can be added to a model to reduce unnecessary impact without diminishing predictive power. After years of work learning how to implement the requirement of disparate impact, many financial institutions now have in place well-established protocols for testing new models to make sure they do not cause unnecessary adverse impact on protected groups and use the most efficacious combination of variables to ensure optimal fairness and predictive power.

14. This process, driven by the necessity of identifying and implementing less discriminatory alternatives to a wide range of policies and practices where viable, has allowed

lenders to find and approve more applicants and thereby earn greater profits without taking on more risk.  Many of the people who would not otherwise be approved are from protected classes.  At the same time, the process does not compel lenders to adopt alternatives that are inconsistent with legitimate business requirements.

15. The importance of compliance with disparate impact, legally and for the bottom line, is matched by lenders' ability to comply.  Leading financial institutions, and many smaller ones, have made substantial investments to develop the infrastructure and knowledge needed to assess whether their policies and practices disparately affect members of protected classes, and to identify appropriate less discriminatory alternatives.  Doing so has become business as usual in all facets of lending, including marketing, underwriting, pricing, servicing, fraud detection, and loss mitigation.  Lenders today appreciate the importance of working within the disparate impact framework and have incorporated protocols for doing so into all their affected operations.

16. Key to the successful development of this infrastructure has been an essentially consistent application of disparate impact by courts and regulators over decades.  Longstanding consistency has allowed the industry to develop sophisticated and efficient processes for applying disparate impact throughout the business, instead of being sent back to the starting line by significant changes.

17. The disparate impact rule promulgated by HUD in 2013 was part of the consistent application.  The rule did not require lenders to change direction.  Rather, the disparate impact compliance work that lenders were already doing when the rule was proposed in 2011 fit well with what the rule required once it was finalized and thereafter.  Lenders were already conducting disparate impact testing and searching for less discriminatory alternatives, and in the manner directed by well-established caselaw and earlier regulatory guidance.  Lenders' settled

expectations remained settled, allowing them to continue reaping the benefits of the systems and expertise they had already built.

18. Significant change to disparate impact under the FHA at this point would be disruptive and costly to those actors within the financial services industry that have made the greatest efforts to comply with existing requirements. After decades of steadiness, it would introduce a great deal of uncertainty about how to comply. Uncertainty when running a business is generally problematic, and it is especially so for running an effective compliance management system. Uncertainty about what disparate impact requires would cause delays in decision making, internal disputes, inconsistency, hesitance about innovation, the expenditure of extra resources, and difficulty in achieving goals.

19. Changing the disparate impact rule in significant ways would upend years of well-established compliance protocols and procedures that have been carefully crafted and honed to identify practices with unnecessary adverse impact on protected groups and find less discriminatory alternatives. It is not prudent business practice to uproot something that has worked well at achieving important business goals, particularly when the practical benefits that have been achieved have required substantial investment over many years. In short, in its current form, expectations about what disparate impact requires are clear; best practices are well-tested and practical; and the results have served consumers and shareholders well. Upending all of that would be costly and counter-productive.

20. It would also cause new legal exposure from regulators and private litigants. Because responsible businesses know how to comply with disparate impact law, they can and do take the necessary steps to reach something close to a safe harbor. If how to comply were to become uncertain, that safe harbor would be gone regardless of a lender's best intentions and

track record. That would eliminate one of the major incentives for diligent compliance with disparate impact as it currently exists.

21.     And if disparate impact under the FHA changed significantly but it did not change under ECOA, it could create even more problems because both statutes apply to housing-related lending like mortgages and home equity lines of credit.  Companies might need to set up separate compliance systems for each statute, with the risk of situations arising in which compliance with one is antithetical to compliance with the other.

22.     In short, significant changes to disparate impact under the FHA would be highly disruptive and costly in numerous ways.  The investments made in compliance infrastructure by many companies over many years would be undermined, forcing them back to the drawing board.  That would not be good for the bottom line.

## **BLDS**

23.     Through my work in the financial services industry, I am familiar with BLDS, LTD and its Director, Dr. Bernard Siskin.  Specifically, I am familiar with the statistical analyses that BLDS does on behalf of lenders to support their fair lending compliance programs.  In my opinion, BLDS is one of the top firms in the country assisting lenders and government agencies on fair lending-related statistical issues.

24.     A substantial portion of BLDS's work involves helping financial services companies apply disparate impact to their automated underwriting models, policies and practices.  This includes testing to see if a lender's existing models, policies and practices disparately impact members of protected classes and, if so, identifying and analyzing the efficacy and impact on protected class members of potential alternatives.  It also includes helping lenders develop new models, policies and practices that have the least disparate impact possible on

protected classes consistent with satisfying business needs, and developing protocols for testing models and practices to see where and how they adversely impact protected groups.

25.     BLDS's business would be harmed if changes to disparate impact were to reduce the incentive for lenders to examine their models, policies and practices for impact and less discriminatory alternatives.  In my experience, although some lenders might continue to follow best practices because it would serve the goal of finding more qualified customers, a substantial portion of the industry would find it more expedient to cease or reduce disparate impact analysis. This would mean less business for BLDS.

26.     I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED WITHIN THE UNITED STATES ON:  October 19, 2020

BY: _____
Jeffrey B. Jaffee