**EXHIBIT B**

## DECLARATION OF LISA RICE

1. My name is Lisa Rice. I am the President and Chief Executive Officer of the National Fair Housing Alliance (NFHA). I am over the age of eighteen and am competent to make this declaration. I have personal knowledge of the matters set forth herein.

2. NFHA is a national, nonprofit, public service, civil rights organization incorporated under the laws of the Commonwealth of Virginia with its principal place of business in Washington, DC. NFHA is a nationwide alliance of more than 220 private, nonprofit, fair housing organizations; state and local civil rights agencies; and individuals from throughout the United States.

3. NFHA's mission is to promote residential integration, combat discrimination in housing, and ensure equal housing opportunity for all people.

4. NFHA works to advance its mission through, among other things, education, outreach, membership services, public policy initiatives, consulting and compliance, community development, advocacy, and enforcement.

5. NFHA's operating members similarly conduct diverse activities related to their fair housing missions, including conducting fair housing advocacy, enforcement, education, and outreach; training of various groups about fair housing rights and responsibilities; engaging with local community leaders on fair housing policies and municipal decision-making; and much more. Locally, NFHA members frequently advocate for less discriminatory policies to be taken by state and local jurisdictions, housing providers, lenders, and others.

6. The well-established disparate-impact standard, as set forth in HUD's 2013 Rule and in caselaw, has greatly facilitated the ability of NFHA and its members to advocate for fairer policies and otherwise further fair housing objectives.

7.  Since its inception, NFHA has supported and engaged in work to encourage and, where necessary, require financial institutions, insurance companies, and others to modify practices that have an unnecessary disparate impact on communities of color and others who have historically been excluded from equal access to housing opportunities.

8.  For example, NFHA and its members have used disparate-impact law to compel insurance companies to drop policies that had the effect of redlining communities.

9.  NFHA and its members also have used disparate impact to address the discriminatory maintenance and management of bank-owned homes in communities of color, resulting in over $56 million in revitalization investments and other important benefits in these areas.

10. These are just two of many examples of NFHA and its members using the Fair Housing Act's disparate-impact doctrine to compel changes to policies and practices that have unjustified discriminatory effect.

11. In my experience, the desire to avoid potential liability provides an important incentive for corporations to work with NFHA and its members in good faith to determine whether their policies and practices create unnecessary disparate impact and explore less discriminatory alternatives. Many companies reflexively refuse to consider less discriminatory alternatives until they see that those alternatives are perfectly consistent with their legitimate needs and may even be in their best interests. In order to have productive conversations, which often lead to win-win solutions, it is vital to have the leverage of a realistic prospect of disparate-impact liability for a company that refuses to consider a less discriminatory alternative. We are frequently able to convince companies or entire industries to change their practices without litigation, but we do so relying on the leverage that disparate-impact law and the availability of feasible enforcement options provide.

12. Although many companies tend to reflexively oppose requests to change unnecessarily discriminatory policies, once they do adopt a less discriminatory alternative, they frequently find that it works well, and sometimes provides a company with more customers rather than fewer. Thus, once we can use disparate impact to get members of an industry to adopt more inclusive policies, it becomes easier to convince other members of that industry to follow suit once they see those policies working profitably.

13. The HUD complaint process has, until now, provided a way to articulate a disparate-impact complaint in a relatively efficient way.

14. Until now, HUD has not required an extensive pleading to initiate this process, which triggers HUD investigation and allows additional information to be obtained. HUD guidance regarding the application of disparate-impact analysis to common fact patterns, such as criminal records bans in rental housing, has further streamlined the process for NFHA members by setting forth exactly what they need to plead to trigger HUD's duty to investigate. Particularly because they lack the resources to do extensive pre-filing investigation, the HUD complaint and resolution process has provided NFHA members with an effective and efficient means to enforce the Fair Housing Act.

15. HUD's changes to the disparate-impact standard will reduce NFHA's leverage with industry players and make it more difficult for NFHA and its members to promote fair housing. Lenders, insurance companies, landlords, and others that would change discriminatory policies if facing an evident risk of liability will not readily do so if they perceive no such risk. This will interfere with NFHA and its members' ability to conduct their activities, and to do so successfully. People in the communities that NFHA and its members serve will be

harmed because of NFHA and NFHA members' reduced ability to vindicate their fair housing rights.

16. HUD's rule makes it much more difficult and expensive—where it is even still possible—to challenge a policy that has unjustified disparate impact.

17. I have overseen or been involved in many investigations of practices that have discriminatory effect, sometimes in anticipation of possible litigation. I am very familiar with the time and expense such investigations generally require.

18. With HUD's rule in effect, NFHA and its members will have to engage in much more involved investigations just to gather the facts that would permit us to plead a case in federal court or charge a case before HUD. For example, we will have to gather specific facts that demonstrate that a defendant's policy is "arbitrary, artificial, and unnecessary." That requires us to anticipate what the defendant's policy justification will be and show in advance that it is entirely invalid, not just that a less discriminatory alternative could accomplish the defendant's legitimate purpose.

19. Such a showing will often be impossible to make, no matter how much time and money we spend investigating. It is not a showing we have ever had to make before to prove a disparate-impact case, let alone to initiate one. This is a brand-new requirement that has no foundation in decades of disparate-impact caselaw and completely changes the nature of disparate-impact law.

20. Requiring HUD complaints alleging disparate impact to meet the pleading standards of a federal-court complaint will fundamentally change that process, shifting the burden to NFHA and its members to gather considerably more information and do considerably more work

just to begin a case. Many NFHA members, which are small non-profits with limited resources, will be unable to avail themselves of the HUD process under the Final Rule.

21. Any complaints we file now will require the investment of far more resources. We will have to forego entirely the filing of many complaints that we otherwise would file. NFHA and its members will be able to assist fewer victims of discrimination, and expend considerably more resources to maintain the same level of effectiveness. People whose rights would otherwise be protected by NFHA's and its members' activities will be harmed because their rights will be violated with impunity, further frustrating accomplishment of our fair housing missions.

22. HUD's changes to the disparate-impact standard have reduced our leverage with industry players and make it more difficult for NFHA and its members to promote fair housing. Lenders, insurance companies, landlords, and others that would change discriminatory policies if facing an evident risk of liability will not readily do so if they perceive no such risk. This interferes with NFHA's and its members' ability to conduct its activities, and to do so successfully. People in the communities that NFHA and its members serve will be harmed because of our reduced ability to vindicate their fair housing rights.

23. NFHA and its members already have had to divert considerable resources to counteracting the effects of HUD's rule. We have had to expend resources to educate various entities about the importance of voluntarily maintaining compliance practices that avoid policies with unnecessary disparate impact, now that it is much less clear that they face significant legal risk by doing otherwise. NFHA thus has been forced to divert resources to ensuring bare compliance with what had been clear Fair Housing Act obligations, forcing it to delay planned initiatives that would further NFHA's mission.

24.  HUD's action directly undermines and interferes with one of our most important current projects, the Tech Equity Initiative. This project encourages the lending and housing industries and others using predictive models to use a NFHA-developed common platform to test their models for discriminatory impact and modify them as necessary to lessen that impact and achieve fairer results. Not only will this project help participating companies make their models less discriminatory, but its widespread use will generate considerable data about how the use of models affects the housing market. NFHA plans to analyze this data, publish results, and convene forums for further discussion and research.

25. HUD's rule eliminates much of the incentive for a critical mass of companies to participate in the Tech Equity Initiative. Many companies will not participate unless they believe using models with unnecessary discriminatory impact exposes them to legal risk, and HUD's rule purports to largely eliminate that risk. NFHA will be forced to divert resources it otherwise would not need to spend to encourage industry players to participate and to educate them and the public about the importance of analyzing models to avoid unnecessary disparate impact. It also has been forced to divert resources away from the roll-out of the program, thus delaying it.

26. NFHA also has been forced to divert resources from, and thereby delay, the planned roll-out of its Keys Unlock Dreams Initiative. This initiative is a coordinated partnership between NFHA, its members, and local communities and stakeholders to educate municipalities about the link between racism, public health, and housing policies, and work jointly towards solutions that address those challenges. NFHA, its members, and partnering organizations and companies have been able to convince some municipalities to, among other things,

declare racism to be a public health crisis and focus on the racial disparities in how

communities experience the COVID-19 pandemic.

27. NFHA has had to divert resources from the Keys Unlock Dreams Initiative, and delay its full

implementation, to prevent backsliding across the board in fair housing compliance as a

result of the Final Rule.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and accurate. Further, I certify that I am qualified and authorized to file this declaration.


Executed within the United States on October 21, 2020.

LISA RICE